642 P.2d 943

John D. ARCHER and Elizabeth Basham Archer, husband and wife, Plaintiffs-Appellants,

v.

MOUNTAIN FUEL SUPPLY COMPANY, a Utah Corporation, and Beker Industries Corporation, a Delaware corporation, Defendants-Respondents.

No. 13360.

Supreme Court of Idaho.

Jan. 26, 1982.

Rehearing Denied April 1, 1982.

Fred J. Hahn and Curt R. Thomsen (argued), of Holden, Kidwell, Hahn & Crapo, Idaho Falls, for plaintiffs-appellants.

Clyde G. Nelson, Soda Springs, and Robert S. Campbell, Jr. (argued), and Glen E. Davies, of Watkiss & Campbell, Salt Lake City, Utah, for defendant-respondent Mountain Fuel Supply Co.

William D. Olson of Racine, Huntley & Olson, Pocatello, for defendant-respondent Beker Industries Corp.

BISTLINE, Justice.

Plaintiffs-appellants, the Archers, brought this action to rescind and terminate certain lease agreements which they had entered into with defendant-respondent Mountain Fuel Supply Company, and to rescind and terminate a sublease agreement between Mountain Fuel and defendant-respondent Beker Industries Corp. The Archers also sought damages for nonpayment of royalties. The leases involved are phosphate leases which the Archers originally obtained from the Department of the Interior. The Archers' complaint sought relief based upon the failure of Mountain Fuel and Beker to mine and develop the leases. Both Mountain Fuel and Beker Industries moved for summary judgment, arguing that as a matter of law they had no duty to mine and develop the property, and that even if they had such a duty the Archers were barred from pursuing this action by the *res judicata* effect of a settlement agreement and judgment entered in Utah in 1971, following a dispute between the Archers and Mountain Fuel. The district court granted the summary judgment motion without specifying a basis for its decision. On denial of the Archers' motion for reconsideration and/or clarification, the court indicated "[b]y reason of the stipulated judgment in the State of Utah and the absence of controversial facts since that judgment leaves the Court without a controversy to be settled by trial." We affirm but on the alternative grounds[1] which were urged upon the trial court.

1. Where a district court's judgment is correct, but entered upon a different theory, it will be affirmed on the correct theory. *Southern Idaho Realty of Twin Falls, Inc. v. Hellhake and Associates, Inc.*, 102 Idaho 613, 636 P.2d 168 (1981); *Matter of Revello*, 100 Idaho 829, 606 P.2d 933 (1979).

2. Paragraph one of the agreement provides:
   "1. First Party will forthwith assign or cause to be assigned to Second Party, subject

I.

In 1962 John Archer and William Coleman obtained from the Department of the Interior a 560 acre phosphate lease for property located in Caribou County, Idaho. This lease, known as the "Dry Valley" lease, was acquired by competitive bidding for approximately $5,000. John and Elizabeth Archer purchased William Coleman's one-half interest in the Dry Valley lease for $7,500 in December of 1962.

That same year, Elizabeth Archer applied to the Department of the Interior for a 120 acre phosphate prospecting permit, which application later ripened into a lease, after Mountain Fuel purchased Elizabeth Archer's interest in the application and performed the work necessary to turn it into a lease. This lease is known as the "Wallentine Ranch" lease.

On December 14, 1962, four days after the Archers had acquired William Coleman's interest in the Dry Valley lease, the Archers and Mountain Fuel entered into an agreement transferring the Archers' rights to certain phosphate properties in Idaho and Utah, including the Dry Valley lease and the Wallentine Ranch permit application, to Mountain Fuel. Under this agreement, the Archers received $40,000, $32,000 of which was for the Dry Valley lease and $1,000 of which was for the Wallentine Ranch permit application. Paragraph four of the agreement stated:

"4. First Party [Archers] will reserve unto themselves and their heirs, executors and assigns, an overriding royalty of fifteen cents ($.15) per ton of phosphate and phosphate rock mined and removed from any of the above described lands under the leases assigned in accordance with paragraph 1 hereof,[2] or any lease or

to the reservation of royalty interests as hereinafter stated:
   "(a) The full and entire lessees' interest in phosphate lease from the United States, bearing Idaho Land Office Serial No. 012989. [Dry Valley lease.]
   "(b) The full and entire applicants' interest in the application for prospecting permit pending before the Department of the Interi-

leases issued pursuant to the permits and applications assigned thereunder, with a minimum annual royalty of Fifteen Thousand and no/100 Dollars ($15,000.00) for a period of ten (10) years, commencing with the calendar year, starting January 1, 1964. Royalty payments made to First Party during any particular calendar year, which are in excess of royalties or tonnage actually mined and removed, shall be credited against royalty due for succeeding years. No minimum royalty shall be payable after the expiration of the ten (10) year period above specified, nor after the royalty payments to First Party have totaled One Hundred Fifty Thousand and no/100 Dollars ($150,-000.00), whichever first occurs."

In December of 1963 the Archers and Mountain Fuel amended this agreement. The provisions of that amendment, with the exception of one paragraph which we discuss below, are not important to this action. The Archers contend that the above quoted paragraph from the 1962 agreement contains a covenant, either express or implied, to mine and develop the Dry Valley and Wallentine Ranch leases. In the alternative, the Archers assert that there are material issues of fact as to whether there is an implied-in-fact covenant to mine and develop the two leases.

### A.

We find no express covenant in paragraph 4 to mine and develop the property covered by the two leases which the Archers now seek to rescind. The Archers do not point to any particular language within the paragraph as containing an express covenant to mine and develop. Rather they simply assert that "[p]aragraph 4 of the 1962 agreement is so worded that mining is proposed by the parties." Paragraph

4, however, simply provides for an overriding royalty of fifteen cents per ton of phosphate mined and removed, with a minimum annual royalty of fifteen thousand dollars to be paid during the ten year period between 1964 and 1974. It does not expressly obligate Mountain Fuel to actually mine or develop the property.

An example of language expressly obligating a party to produce from leased property is found in Section 2(d) of the underlying Dry Valley lease between the Archers and the Department of the Interior, which provides

"Sec. 2. In consideration of the foregoing, the lessee hereby agrees:

. . . .

"(d) *Minimum production.* To prospect diligently the leased lands and beginning with the fourth year of the lease, except when operations are interrupted by strikes, the elements, or casualties not attributable to the lessee, or unless operations are suspended as provided in section 39 of the act, to mine each year the leased deposits and pay a royalty thereon to a value of $1 an acre or fraction thereof, or in lieu thereof, pay a minimum royalty of $1 an acre or fraction thereof. The lessee may, at any time prior to the end of the thirtieth month of this lease, file a petition with the Mining Supervisor to have the minimum production specified herein changed to a lesser figure, supporting such petition by the required showing and if the lessor finds that the facts warrant such action, he will change the requirement to a lesser figure."

An identical provision appears in the Wallentine Ranch lease which was ultimately issued to Mountain Fuel. Since the Archers were lessees under the original lease, it is manifestly evident that they were aware that language expressly obli-

---

or of the United States, and bearing Idaho Land Office Serial No. Idaho 013649. [Wallentine Ranch prospecting permit.]

"(c) The full and entire lessees' interest in phosphate lease from the United States, bearing Utah Land Office Serial No. 06929.

"(d) The full and entire lessees' interest in phosphate leases from the State of Utah,

bearing State of Utah Lease Nos. 4684, 4685, 4859, 19535 and 19526.

"The above instruments of assignment shall be on a form satisfactory to Second Party, and First Party agrees to cooperate with Second Party in securing the necessary governmental approval of such assignments."

gating lessees to mine could have been included in the lease with Mountain Fuel. We draw no inferences from the absence of such language in the Archer/Mountain Fuel agreement. We simply note that it is not present.[3]

The Archers argue that the language of paragraph 4 of the 1962 agreement is, at a minimum, ambiguous, and that parol evidence should be admitted to clarify what the parties intended to be the meaning of paragraph 4. We do not see any ambiguity in the language of paragraph 4 of the 1962 agreement, at least in regard to a covenant to mine and develop the property that is the subject of the leases. There is no language in paragraph 4 that could possibly be construed as such a covenant. While the paragraph does address royalties for ore mined, and it would be useless to discuss royalties unless the parties contemplated mining the property—indeed, the sole purpose of the lease was to allow Mountain Fuel to mine the property—there is a tremendous difference between assigning the *right* to mine certain property, subject to a condition that royalties be paid, and imposing an *obligation* to mine property. "Where a contract is clear and unambiguous, a determination of its meaning and legal effect are questions of law for determination by the court." *Beal v. Mars Larsen Ranch Corp.*, 99 Idaho 662, 668, 586 P.2d 1378, 1384 (1978).

There is no language in the 1962 agreement, ambiguous or otherwise, imposing an obligation to mine the leased property. In fact, the minimum royalties provisions in paragraph 4 of the agreement suggest that the parties contemplated that mining might not occur. "Minimum royalties are fixed and the obligation therefor is in consideration of the *right* to use, regardless of whether [the right] is used or not." *Elgin National Watch Co. v. Bulova Watch Co.*, 115 N.Y.S.2d 479, 482 (1952) (emphasis added) (addressing minimum royalties under license to use invention). There are no

issues of material fact as to whether the 1962 agreement contains an express or ambiguous covenant on the part of Mountain Fuel to mine and develop the Dry Valley and Wallentine Ranch leases.

### B.

The Archers contend that even if the 1962 agreement contains no covenant to mine and develop the leased property, the record raises material questions of fact as to whether there was an implied-in-fact covenant to mine arising from the agreements, negotiations of the parties, and their prior and contemporaneous conduct. As noted above, however, the Archers in 1963 signed an agreement supplementing their 1962 agreement. Paragraph 10 of the 1963 supplemental agreement specifically states:

"10. The Agreement of December 14, 1962, and this Agreement constitute the complete and entire understanding and agreement between the parties and each party acknowledges that there are no rights, promises, representations, warranties, understandings, agreements, or obligations between the parties not expressed in the original Agreement of December 14, 1962, and this Agreement."

■ The Archers do not contend that the 1963 agreement was not negotiated at arm's length, and the record shows that the Archers entered into the agreement voluntarily and with full knowledge of its provisions. Having contractually stipulated in 1963 that no covenants other than those actually contained in the 1962 and 1963 agreements were made between the two parties, the Archers may not later assert that there *was* a separate covenant, the existence of which may be implied from the facts surrounding the formation of the two contracts.

### II.

■ We turn now to the Archers' contention that this Court should, on the basis of the facts revealed by the record, impose

---

3. Mountain Fuel and Beker have at all times paid the minimum royalty of $1 an acre in lieu of the duty to mine as provided by the underlying leases with Interior. Thus, no duty to mine arose at any time under the original Dry Valley or Wallentine Ranch leases.

upon Mountain Fuel and Beker Industries an implied-in-law duty to mine and develop the leases. The facts revealed by the record are these: The Archers in 1962 paid a total of $10,000 to acquire the Dry Valley lease; the application for the Wallentine Ranch prospecting permit cost them nothing. Four days after acquiring the rights to the Dry Valley lease, the Archers subleased the phosphate rights to that lease and the Wallentine Ranch prospecting permit to Mountain Fuel Supply Company for $33,000 plus a guaranteed minimum royalty of $15,000 a year for ten years beginning in 1964. Mountain Fuel thus paid the Archers, over a period of time, $183,000 for the right to mine the Dry Valley and Wallentine Ranch leases. The Archers were thus guaranteed that they would recoup their investment 18 times over. The Archers admit, as they must on this record, that those cases which have found an implied-in-law duty to mine where royalties were the *only* consideration for the lease rights are inapplicable here. See *Rocky Mountain Fuel Co. v. Clayton Coal Co.*, 110 Colo. 334, 134 P.2d 1062 (1943); *Eastern Kentucky Mineral & Timber Co. v. Swann-Day Lumber Co.*, 148 Ky. 82, 146 S.W. 438 (1912); *Cotner v. Mundy*, 219 P. 321 (Okl.1923). The Archers, however, urge two propositions upon us. The first is that "a substantial initial payment for a mineral property does not eliminate the implication of an obligation to develop and work the property." In support of this proposition the Archers cite *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039 (1928), and *Taylor v. Kingman Feldspar Co.*, 41 Ariz. 376, 18 P.2d 649 (1933). In *Freeport*, however, the court found an implied covenant to develop from the express language of the contract of sale.[4] As we have already stated, no such covenant can be implied from the agreement at issue here. To the extent that *Freeport* can be read to

impose an *implied-in-law* duty to mine and develop property despite payment of substantial consideration other than production royalties, it stands alone and we decline to follow it. In *Taylor*, the "substantial consideration" paid was expressly designated as an advance on royalties, and therefore *no* consideration other than royalties was involved. The case more properly belongs in that category of cases finding an implied-in-law duty to mine where royalties are the *sole* consideration supporting a lease. As the *Taylor* court itself said, "[w]hen mining claims are leased on a royalty basis, the only way in which the lessor can get anything for his property is through the lessees working it." 18 P.2d at 651. An independent review reveals no cases in which a court has imposed an implied-in-law obligation to mine, separate and apart from the language of an agreement, where substantial consideration was paid in exchange for a mining lease. We are not persuaded that we should now create such a rule. An obligation to mine and develop can be an onerous burden, for example when market conditions are such that development would surely result in a net loss to the lessee. Nothing prevents parties to a contract from bargaining for such an obligation, but no reason sufficient to compel us to judicially impose the obligation in the absence of an agreement has been shown.[5]

The Archers next urge the rule set forth in *Dulin v. West*, 35 Colo.App. 6, 528 P.2d 411, 412 (1974), that "where the minimum annual rental is miniscule in relation to reasonably contemplated profits from the operation . . . the lease may be terminated in an action to quiet title [based on failure to mine and develop]." In essence, the Archers argue that the reasoning behind those cases which impose an implied-in-law duty to mine and develop when there is no consideration other than minimum royalties should also apply when it is patently evi-

---

4. The *Freeport* case is not clear as to whether an implied duty to *mine* the property existed, or simply an implied duty to *produce* sulpher (from the plant). *See* Martz and Hames, Implied Rights of Royalty Owners, 30 Rocky Mt.L. Rev. 1, 8 (1957).

5. We note that imposing such an obligation in this case might result in a forfeiture of the leases by Beker and Mountain Fuel and consequent windfall to the Archers, who have received $183,000 without having any of the ore available under the leases depleted.

dent that the initial consideration was not intended to be the entire consideration. For example, the *Dulin* court implied such an obligation where the only non-royalty consideration for a valuable peat moss lease was $10 annual rental. We need not reach the question of whether we would imply such a duty if the non-royalty consideration was "miniscule," however, because in this case the non-royalty consideration was substantial. The converse of the rule urged by the Archers, which is also set out in the *Dulin* opinion, is that "[w]hen minimum royalties and annual rentals provided for in a lease are reasonably substantial in relation to the anticipated return from the property, they are in effect an agreed compensation to the lessor for the lessee's failure to achieve reasonable production." *Dulin, supra,* 528 P.2d at 412. *See Smith v. Long,* 578 P.2d 232 (Colo.App.1978) (no covenant to explore will be implied where $5,000 was paid for lease rights); *Olson v. Pedersen,* 194 Neb. 159, 231 N.W.2d 310, 315 (1975) ("an implied obligation to continue to develop is eliminated because the lease provides for payment of a minimum annual royalty [or $500] which was in fact paid or tendered."); *Vitro Minerals Corp. v. Shoni Uranium Corp.,* 386 P.2d 938 (Wyo.1963) (initial consideration of $50,000 bars lessor from rescinding lease for failure to develop). *See generally* Annotation, 87 A.L.R.2d 1076, 1078 (1963) ("where the minimum royalties or annual rentals appeared reasonably substantial in relation to the expected return from the property, [the minimum royalties] represented, in effect, an agreed compensation to the lessor for the lessee's failure to observe and perform the duty, express or implied, to implement reasonable production.").

Here, the minimum annual royalties of $15,000 per year for ten years were clearly "reasonably substantial" in relationship to the anticipated returns. The Archers allege in their complaint that the Dry Valley and Wallentine Ranch leases combined would produce some 20 million tons of phosphate ore. All parties agree that the properties would produce at least 10 million tons, and Mountain Fuel at one point estimated that some 13 million tons could be extracted. Although the record does not compel us to accept the Archers' 20 million ton estimate, even if we use that figure for comparison, the consideration which the Archers received was reasonably substantial. A $.15 per ton royalty on 20 million tons would yield $3,000,000. The Archers received $33,000 initial consideration plus $150,000 in minimum annual royalties, for a total of $183,000 or a guarantee of at least 6% of the most optimistic estimate of what their returns might be.[6] While this figure is not overwhelming, neither is it so "miniscule" as to compel us to judicially impose an obligation to mine and develop the leased properties upon Mountain Fuel and Beker Industries. The Archers received the $33,000 plus the guarantee of minimum royalties within four days of acquiring the leases for $10,000. Additionally, these figures cannot be viewed in a vacuum. At the time that the agreement was entered into no mining had actually taken place and the exact amount of ore on the properties, the economic feasibility of extracting the ore at any particular rate, and the return to Mountain Fuel, or for that matter the Archers had they chosen to develop the property themselves, from mining the property were all somewhat speculative.

At least one court has taken the approach that a covenant to mine and develop will be implied only when it appears that such a covenant was so clearly within the contemplation of the parties that they felt it unnecessary to include the covenant in an instrument transferring interests. *See Danciger Oil & Ref. Co. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 636 (1941). This is in accord with the general rule of contract law that "[t]erms are to be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because of sheer

6. When compared to royalties from the 10 million ton figure upon which all parties agree, the $183,000 becomes even more substantial—18%.

inadvertence or because they are too obvious to need expression." 17 Am.Jur.2d *Contracts* § 255 at 651 (2d ed. 1964). This rule explains the reasoning behind the results reached by courts which have considered the question of whether an obligation to mine and develop property should be implied or not—if reasonably substantial compensation was paid to the lessor for the *right* to mine certain property, the conclusion that the parties intended to also impose an *obligation* to mine is not "too obvious to need expression." This is a salutory rule and we apply it here. We cannot, under the circumstances presented here, judicially impose such an obligation.

### III.

Finally, the Archers argue that Mountain Fuel is estopped to deny that it had an obligation to mine and develop the two leases. The Archers also argue that, although promissory estoppel was not specifically pled, its elements are present in their complaint and the theory was acknowledged by and argued to the trial court. We agree that the theory was before the trial court. We do not agree, however, that the record raises any genuine issue of material fact concerning an estoppel on the part of Mountain Fuel to deny an obligation to mine and develop the leased property. The elements of equitable estoppel are:

> " '(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.' " *Tew v. Manwaring*, 94 Idaho 50, 53, 480 P.2d 896, 899 (1971)

(quoting *Dalton Highway District of Kootenai County v. Sowder*, 88 Idaho 556, 401 P.2d 813 (1965)).

 Although the record does indicate that Mountain Fuel at all times prior to the agreement intended to mine and develop the property, as we have already noted there is a great deal of difference between intending to mine the property and expressly *promising* to mine the property. Nothing in the record shows that Mountain Fuel ever promised to or otherwise obligated itself to develop the property.

The judgment of the district court is affirmed.

BAKES, C. J., and McFADDEN and DONALDSON, JJ., concur.

SHEPARD, J., concurs in the result.