716 P.2d 1356

Gary SALAZAR, Plaintiff-Respondent,

v.

Clarence TILLEY and S & J Leasing, Defendants-Appellants.

No. 15897.

Court of Appeals of Idaho.

March 24, 1986.

R.M. Whittier of Whittier & Souza, Pocatello, for defendants-appellants.

James E. Harward, Pocatello, for plaintiff-respondent.

SWANSTROM, Judge.

This case involves a dispute over the terms of an oral agreement concerning a mortgage broker's commission. The broker, Gary Salazar, and the borrower, Clarence Tilley allegedly reached an agreement that Tilley would pay Salazar $5,000 for producing a financial funding commitment. Salazar brought this action against Tilley and S & J Leasing [1] for recovery of the fee. The district court, finding that Salazar performed his part of the agreement, awarded Salazar $5,000. On appeal, Tilley asks us to decide ten separately stated issues. However, all the issues relate to two basic questions: (1) whether the district court correctly determined that general Idaho contract law applies to this case; and (2) whether the district court's findings of fact and conclusions of law are supported by substantial, competent evidence. For reasons which follow, we affirm the judgment.

The agreement between the parties was entered into in the state of Utah. The events leading up to the agreement can be summarized briefly. Tilley had invested in a project known as "Queen Creek," a pecan farm in Arizona. To rescue the Queen Creek operation from foreclosure by a sheriff's sale and to protect his investment, Tilley needed to raise a large amount of money to buy out the operation. According to Tilley, a bank in Arizona was prepared to loan him two million dollars on a short term basis, but only if another lender would commit to "take out" the bank with a long term loan. Tilley first contacted

---

1. While S & J Leasing has been named as a party throughout these proceedings, it was not established in the record that S & J Leasing was anything more than an assumed business name used by Tilley on some occasions. Therefore, we treat Tilley as the only defendant-appellant in this opinion.

Leon Harward of Salt Lake City in an effort to find a source of funding. After Harward's company declined to finance the Queen Creek project, Harward introduced Tilley to Salazar to see if Salazar could arrange for funding.

During the negotiations between Salazar and Tilley, Salazar presented to Tilley an "exclusive" financial service agreement which set out Salazar's fees and conditions for finding a source willing to arrange financing. Tilley refused to sign the document. As a replacement for the written agreement, Tilley, in the presence of Harward, agreed that he would leave a check for $5,000 with Harward. Upon Salazar's delivery of a loan commitment letter to Harward, the $5,000 check was to be turned over to Salazar by Harward. Tilley had written on the face of the check, "release upon getting a commitment to loan on Queen Creek project."

Approximately one week later, Salazar delivered to Harward what he terms a "commitment letter" for Tilley from a financial institution. Three days later, Tilley picked up a copy of the letter from Harward. About this time, Harward deposited Tilley's check. However, the copy Tilley received had the name of the financial institution and the appropriate signatures blanked out. Apparently, this was done by Salazar to protect his source of funding from access by persons who might wish to avoid paying Salazar's fees. Tilley took the blanked-out copy of the letter to a friend of his, who had previously been a banker. Tilley was informed by his friend that the letter was insufficient to secure a loan through a bank as there was no signature on the document, no financial institution named and no commitment to loan money. After this discussion, Tilley informed Harward that the letter was insufficient for his needs and he stopped payment on the check, which had not yet cleared the bank. Tilley informed Harward he was willing to go forward with the agreement as soon as he received a letter of commitment which would enable him to obtain a loan. No further action was taken

by either party. Subsequently, Salazar brought this suit.

Idaho law provides that a "loan broker" shall not receive a fee "unless a loan or extension of credit is made or unless a commitment to loan or extend credit is made by any person [listed as exempt from the act by § 26–2502]." I.C. § 26–2503. However, "loan broker" is defined as "any person ... [who] offers for compensation, *in this state*, to arrange for a loan or other extension of credit." I.C. § 26–2501. (Emphasis added.) The agreement between Salazar and Tilley was formed in Utah. Therefore, by its own terms, the Idaho statute is not applicable to the present case. Tilley argues that the trial court should have presumed Utah had an identical statute which would apply to transactions occurring in Utah. Tilley cites the general principle that, in the absence of proof to the contrary, the law of a foreign jurisdiction, where pertinent, is presumed to be the same as the law of the forum. *In Re Foster*, 77 Idaho 26, 287 P.2d 282 (1955). He argues that no one alleged or proved that Utah's statutes were any different from the Idaho statutes referred to above. Therefore, he concludes that the court erred in (1) assuming Utah law was different and (2) in not applying "Idaho" law to the facts of this case. We think that Tilley is actually arguing—in a round-about way—that the trial court should have applied *Utah* law and should have presumed it to be similar to the quoted Idaho statutes. For reasons hereinafter stated, we are unpersuaded by this argument.

Rule 44(d), I.R.C.P., then in effect, stated in relevant part:

> If either party to an action intends to request the court to take judicial notice of the statutes or laws of a foreign state, a brief or memorandum citing such foreign law shall be submitted to the court and opposing counsel at least ten (10) days prior to trial or hearing. Opposing counsel may reply thereto within five (5) days following service of such brief. Failure to submit such brief may in the

discretion of the court constitute a waiver of the request.

The record establishes this procedure was not followed by Tilley. Furthermore, as Tilley points out, no one had alleged that any foreign law should be applied. The district court did not, in fact, take judicial notice of Utah law. The district court was obliged to apply Idaho law and, after discovering that I.C. §§ 26–2501 to –2506, the "loan broker" statutes, were not applicable, the court had no recourse but to apply general Idaho contract law.

■■■ We now address whether the district court's findings of fact are supported by the evidence and whether those findings support the conclusions of law. *Fahrenwald v. LaBonte,* 103 Idaho 751, 653 P.2d 806 (Ct.App.1982). An appellant has the burden of showing error when findings of fact by the trial court are challenged, and the evidence will be reviewed in a light most favorable to the respondent. *Jones v. Mountain States Tel. & Tel. Co.,* 105 Idaho 520, 670 P.2d 1305 (Ct.App.1983). Findings of fact made by a court will not be overturned on appeal if they are supported by substantial, competent, though conflicting, evidence. *Tippett v. Bayman,* 105 Idaho 744, 672 P.2d 1074 (Ct.App.1983).

■■ The dispute between the parties focuses on whether the letter of commitment was to serve as a guarantee for a bank to loan money or to serve as a commitment to fund the project once certain conditions had been met by Tilley. "[T]he question of whether there was a sufficient meeting of the minds to form an agreement is to be determined by the trier of fact." *Rasmussen v. Martin,* 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct.App.1983). The credibility of each witness is to be determined by the trial court and we are precluded from substituting our opinion of a witness's credibility for that of the trier of fact. *Erhardt v. Leonard,* 104 Idaho 197, 657 P.2d 494 (Ct. App.1983). An appellate court must afford deference to a trial court's opportunity to assess and weigh the credibility of witnesses. *Rueth v. State,* 103 Idaho 74, 644 P.2d 1333 (1982).

Salazar testified that prior to the formation of the oral agreement he had reviewed with Tilley a sample document of a commitment letter. Salazar said that Tilley agreed he would accept such a letter. According to Salazar the agreement was that, upon delivery of a letter similar to the one he had shown Tilley, Harward would release the $5,000 check. Salazar further testified that when he delivered the letter of commitment to Harward, Harward called Tilley. Salazar heard Harward inform Tilley that he had the commitment. Harward read the complete letter to Tilley and explained to him that he was releasing the check. Salazar further testified that because the call was made on a speaker telephone he could also hear Tilley's statements. According to Salazar, Tilley agreed to the release of the check. At this time, Tilley voiced no objection to the commitment letter. Salazar testified that he left a copy of the completed commitment letter with Harward.

The overall arrangement with Tilley, according to Salazar, was to find a source of long term financing for four million dollars. This was to be a process consisting of different phases. Salazar asserted that Tilley was aware of the steps involved in obtaining the funding; the first step being a commitment to syndicate a corporation to fund the Queen Creek project. It is Salazar's position that if Tilley had fulfilled the conditions of the commitment letter then a formal guarantee would have been issued.

Harward also testified as to his view of the transaction. Harward said that the commitment letter delivered to him by Salazar met the terms to which Tilley and Salazar had agreed in his office. Harward also testified that Tilley learned who had issued the commitment letter when Harward called Tilley on the telephone and read the letter to him. Harward further testified that, in his experience, the letter generally fulfilled the requirements of a commitment letter. Particularly, he testified that the letter was similar in form to one that Tilley had approved earlier in discussions with Salazar. Harward did not support Tilley's

contention that the letter had to be approved by Tilley's Arizona bank or had to be sufficient itself to produce the interim loan from the bank.

In Tilley's view, Salazar was to deliver "a letter of commitment that the bank would accept ... [as the bank] had already agreed to loan me two million dollars upon a letter of commitment by an institution that was big enough to take care of it." Tilley's brother, who was present during some of the discussions, also testified that Tilley and Salazar discussed a letter that Tilley could take to his bank and obtain an interim bank loan on the strength of a commitment that new long term financing would be forthcoming. Tilley admitted that Salazar had indeed presented him with the form of letter that Salazar had used in the past for a commitment letter. Tilley testified that Salazar "projected a mimeograph form of something that he had worked out with someone else. He says that it wouldn't be exactly the same but it would be similar."

A review of the commitment letter reveals there were several conditions Tilley was to comply with, before the agreement to finance would be finalized. Salazar testified that to his knowledge commitment letters always carried conditions. Further he testified he had gone over these conditions with Tilley prior to their agreement. Under the terms of the commitment letter, Tilley was to put up $25,000 to be used in part to pay underwriting counsel fees and expenses. Salazar testified that Tilley knew of the $25,000 fee from the first day Salazar spoke with him. Tilley did not dispute this except to say he understood these fees could be paid from the loan proceeds.

Upon a review of the record, we conclude there is substantial and competent evidence to uphold the district court's finding of fact that the parties did reach an agreement "whereby the plaintiff [Salazar] was to provide a financial funding commitment to the defendant [Tilley] in exchange for defendant's payment to the plaintiff of $5,000." The evidence also supports the finding that Salazar did provide a "valid financial funding commitment" to Tilley. The record supports the district court's findings of fact and conclusions of law, although that evidence is conflicting. Therefore, the judgment of the district court is affirmed. Costs to respondent Salazar. No attorney fees on appeal.

WALTERS, C.J., and BURNETT, J., concur.