824 P.2d 178

**DEUTZ–ALLIS CREDIT CORPORA-TION, a Wisconsin corporation, Plaintiff–Respondent,**

v.

**BAKIE LOGGING, a partnership, Gwen Brandt Voves and Arnold Bakie, Defendants–Appellants.**

**BAKIE LOGGING, a partnership, Gwen Brandt Voves and Arnold Bakie, Third Party Claimants–Appellants–Cross Respondents,**

v.

**EMPIRE MACHINERY COMPANY and Fiat Allis Credit Corporation, Third Party Defendants–Respondents–Cross Appellants.**

No. 18296.

Court of Appeals of Idaho.

Jan. 6, 1992.

Fred W. Gabourie, Jr., Post Falls, for defendants-appellants.

Lukins & Annis, Coeur d'Alene, for plaintiff-respondent Deutz–Allis Credit. Richard Wayne Sweney argued.

Wallace & Wallace, Coeur d'Alene, for third party defendant-respondent-cross appellant Empire Machinery. Richard P. Wallace argued.

SILAK, Judge.

This case involves the sale of a crawler tractor (dozer) by Empire Machinery Co. (Empire) to Bakie Logging Co. (Bakie). The purchase money security interest which Empire retained in the dozer was later assigned to Deutz–Allis Credit Corporation (Deutz–Allis). After Bakie's payments became delinquent, Deutz–Allis sued Bakie to recover the dozer and the balance still owed on the contract. Bakie impleaded Empire alleging misrepresentation, breach of contract, and breach of warranty. Empire counterclaimed against Bakie, seeking to recover payment for repairs it had performed on the dozer. Deutz–Allis subsequently repossessed the dozer, and resold it at a public auction. After trial, the district court awarded Deutz–Allis a deficiency judgment against Bakie and dismissed the respective claims of Bakie and Empire. The trial court awarded Deutz–Allis its attorney fees and ordered Bakie and Empire to pay their own attorney fees. Bakie appealed and Empire cross-appealed, both challenging the district court's factual findings. Because we conclude there was substantial evidence to support the district court's judgment, we affirm.

## I. Facts and Procedural Background

Because of the posture of this case on appeal—the parties contest only the factual findings of the trial court—we present here only a recitation of the facts as found by the trial court. The facts, as portrayed by the parties at trial, will be discussed more completely below in the sections where those facts are in issue.

In May of 1986, Arnold Bakie (Mr. Bakie), co-owner of Bakie, went to Empire to view a dozer that was for sale. Empire's salesman, Ron Brooks, represented to Mr. Bakie that the dozer was "like new" and "logging ready," having been equipped with a "logging package." Mr. Bakie subsequently took the dozer and used it at one of Bakie's job sites for a demonstration period of approximately one week. Prior to purchasing the dozer, Mr. Bakie insisted that the dozer come with a factory warranty. Empire contacted the manufacturer who agreed to give Bakie a power train warranty on the dozer which would expire on June 15, 1987. Empire never described the scope of this power train warranty to Bakie, and no other warranties were given.

On June 3, 1986, Bakie purchased the dozer from Empire for use in its logging business. The dozer was purchased on an installment-sale contract for $70,000. Bakie paid $5,000 down, leaving a balance of $65,000 to be paid in 45 monthly installments of $2,055.85. Pursuant to the contract, Empire retained a purchase money security interest in the dozer. Empire subsequently assigned its rights under the contract to Deutz–Allis. The contract also provided that Bakie would pay the costs, expenses, and legal fees incurred by Deutz–Allis in enforcing its rights under the contract.

After using the dozer for approximately sixteen months, Bakie's lawyer gave Deutz–Allis written notice that Bakie intended to rescind the sales contract. At this time, Bakie was already in default on the contract for failing to make payments when due. Bakie continued to use the dozer after giving notice of rescission.

In December, 1987, Deutz–Allis sued Bakie on the sales contract, seeking possession of the collateral and payment of the balance due on the contract. Bakie subsequently impleaded Empire, alleging breach of contract, breach of warranty and misrepresentation. Bakie claimed that the dozer was defective and inadequate for performing its intended logging functions, contrary

to Empire's representations and warranties. Empire counterclaimed against Bakie, seeking payment for repairs Empire performed on the dozer's winch on July 29, 1986.

In February, 1988, Bakie voluntarily surrendered possession of the dozer to Deutz–Allis. Deutz–Allis placed the dozer on one of its dealer's lots in Moscow, Idaho, and solicited bids for its sale. No private sale of the dozer was made, however. On April 11, 1988, Deutz–Allis gave written notice to Bakie of its intention to sell the dozer at a public auction in Moscow, Idaho, on May 14, 1988. The auction was advertised in numerous newspapers published in various cities in Idaho, Washington, and Oregon. Notice of the sale was also given by fliers distributed to various individuals and groups. On May 14, 1988, the dozer was sold at the public auction for $24,000. The net proceeds of the sale, $22,783.21, were applied to the sales contract, leaving an unpaid balance of $47,965.70. Although Mr. Bakie received notice that the dozer would be sold at the auction, and personally attended the auction, he made no objection to the time, place or manner of sale.

A trial to the court was subsequently held, after which the district court found that the resale of the dozer had been performed in a commercially reasonable manner and awarded Deutz–Allis a deficiency judgment of $47,965.70, plus interest from May 14, 1988, as well as its reasonable costs and legal fees incurred by enforcing the contract. With respect to Bakie's third-party claims of misrepresentation against Empire, the district court found that Bakie had failed to establish by clear and convincing evidence that Empire misrepresented either the logging readiness of the dozer or the warranties that would come with the dozer. With respect to Bakie's breach of warranty claim against Empire, the trial court found that Empire's refusal to apply the power train warranty to winch repairs performed on July 29, 1986, was a breach of the warranty. The court also found, however, that Bakie suffered no damage as a result of this breach, inasmuch as Bakie had properly refused to pay Empire for the repairs. The trial court found that, except

for this winch repair, Empire had fully performed under the power train warranty, and no other warranties were given. Accordingly, the district court also ruled against Empire on its third-party counterclaim against Bakie in which it sought payment for the same winch repairs. Pursuant to these findings, the district court dismissed Bakie's and Empire's claims against each other and refused to award attorney fees to either party, finding that neither had prevailed for the purposes of I.R.C.P. 54. Bakie then appealed, and Empire cross-appealed, both challenging the district court's factual findings.

## II. Standard of Review

 Where, as here, the appellants challenge the trial court's findings of fact, the appellants have the burden of showing error, and the evidence will be viewed in a light most favorable to the respondent. *Salazar v. Tilley*, 110 Idaho 584, 587, 716 P.2d 1356, 1359 (Ct.App.1986). In reviewing a trial court's factual findings, we must keep in mind that it is within the province of the trial court, as the trier of fact, to weigh the conflicting evidence and to judge the credibility of the witnesses. I.R.C.P. 52(a); *Alumet v. Bear Lake Grazing Co.*, 119 Idaho 946, 949, 812 P.2d 253, 256 (1991); *Abbott v. Nampa School Dist. No. 131*, 119 Idaho 544, 547–48, 808 P.2d 1289, 1292–93 (1991). The trial court is the arbiter of conflicting evidence, and we will not set aside its factual determinations unless they are clearly erroneous. *Id.* This rule of deferential review reflects the view that we are to give due regard to the special opportunity of the trial judge to assess and weigh the credibility of the witnesses who appear before it personally. *Alumet*, 119 Idaho at 949, 812 P.2d at 256. Thus, where the trial court's factual findings are based on substantial although conflicting evidence, those findings may not be disturbed on appeal. *Id.; Abbott*, 119 Idaho at 547, 808 P.2d at 1292.

## III. Issues

Bakie's appeal requires us to determine whether there is substantial evidence to

support the following findings made by the trial court: (1) that Bakie failed to prove by clear and convincing evidence that Empire made actionable misrepresentations when it sold the dozer to Bakie; (2) that, except for refusing to cover the July 29, 1986, winch repairs, Empire did not breach any express or implied warranties given to Bakie; (3) that Bakie was not entitled to rescission of the sales contract; and (4) that the resale of the dozer was conducted in a commercially reasonable manner. Empire's cross-appeal requires us to determine whether there is substantial evidence to support the trial court's finding that the repairs Empire performed on the winch should have been covered under the power train warranty, and whether the trial court erred in refusing to award Empire its attorney fees. Additionally, we must determine the issue of costs and attorney fees on appeal.

■ 1. *Alleged Misrepresentations by Empire.* On appeal, Bakie argues that Empire's salesman, Brooks, made material misrepresentations when he stated that the dozer was "logging ready," that the dozer would come with a factory warranty, and that the winch on the dozer was like new. We will discuss each of these alleged misrepresentations in turn. In doing so, we must keep in mind that the party alleging the fraudulent misrepresentation has the burden of proving each element of misrepresentation by clear and convincing evidence. *Faw v. Greenwood,* 101 Idaho 387, 389, 613 P.2d 1338, 1340 (1980). The elements of an action for fraudulent misrepresentation are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Id.* "The issue as to whether fraud has been proven by clear and convincing evidence is for the determination of the trier of fact. On appeal that determination will

not be reversed where supported by competent, substantial, though conflicting evidence." *Smith v. King,* 100 Idaho 331, 334, 597 P.2d 217, 220 (1979). Therefore, the issue we must determine is whether the district court had before it substantial evidence to support its finding that Bakie had not proved the misrepresentations by clear and convincing evidence.

■ To support its claim that Empire misrepresented that the dozer was logging ready, Bakie offered the testimony of Mr. Bakie to show that, contrary to Empire's representations, the logging package on the dozer did not adequately fortify the dozer for logging work, and, hence, the dozer was not logging ready. Mr. Bakie testified that because the belly pans on the dozer were not made of T1 gauge iron, and lacked cross-braces, they were too weak to protect the dozer's undercarriage during logging operations. He also testified that the logging package should have included protective armor around the dozer's muffler, and that Empire's welding of the bulldozer blade to the dozer was defective. Bakie argues that because of these conditions, the dozer was unable to withstand the rigors of logging in the woods and, as a result, incurred substantial "downtime," as well as costly damage to its belly pans, undercarriage, blade, and muffler.

In contradiction to Bakie's evidence, Deutz–Allis and Empire presented evidence showing that the dozer was, in fact, logging ready when purchased by Bakie, both in terms of the logging package's suitability and the amount of use that Bakie exacted from the machine in its logging business. Bill Conger, co-owner and general manager of Empire, testified that the protective armor on the dozer was ordered from a heavy equipment manufacturer in Oregon, and was specifically ordered as a "logging package."

The record reveals that a "logging package" consists of protective and supportive armor that is mounted onto a dozer to enable it to withstand the rigors of logging in the woods, and such packages of armament commonly include items such as belly pans to protect the dozer's undercarriage

from rocks and stumps; rock guards to protect the dozer's tracks, sprockets, pins and bushings; and a canopy with screens to protect the dozer's operator. While it appears from the record that belly pans are always included in logging packages, the record also indicates that there is no "standard" logging package installed on dozers used in the logging industry; different pieces of armor, of varying strengths, may be included in the package, depending on what the owner orders from the manufacturer. The logging package installed on the dozer involved in this case included belly pans, sweeps, rock guards, a canopy with screens, a six-way bulldozer blade, and a winch.

The record is clear that Mr. Bakie had at least fifteen years experience in the logging industry, and was familiar with logging equipment, including dozers. Various witnesses testified that it is common for loggers to "beef up" the belly pans that come stock from the factory before taking the dozer out into the woods. In spite of this common practice among loggers, the record shows that Mr. Bakie never made any inspection or inquiry regarding the dozer's logging package; i.e., the tensile strength of the metal used for the belly pans, whether the belly pans had been "beefed up," and whether the welds mounting the armor to the dozer had been performed adequately. In addition, it was undisputed that prior to purchasing the dozer, Bakie took the dozer for a one-week demonstration period. During this demonstration period, Bakie used the dozer at one of its logging sites, and had the opportunity to inspect it thoroughly and to observe its performance. While Bakie offered testimony that the dozer's logging package should have included protective armor around the muffler, the record shows that whether the dozer's muffler had protective armor around it was a patent fact readily discernible to Bakie prior to purchasing the dozer.

Mr. Bakie testified that the reason why the belly pans were not logging ready, and therefore caved in during operation, was because they were not made of T1 gauge iron and reinforced with cross-pieces. Mr. Bakie's own testimony contradicts itself, however, inasmuch as he also testified that after the belly pans caved in the first time and he had them straightened and reinforced with T1 gauge iron and cross pieces, they again caved in during logging operations. The record also contains testimony to the effect that the fact that the belly pans bent and the blade broke does not necessarily mean the logging package was inadequate or defective. An expert witness for Deutz–Allis testified that it is not unusual for dozer blades and belly pans to bend and break during logging operations and to need straightening and rewelding.

The district court also had substantial evidence from which to conclude that the dozer was, in fact, logging ready, based on the use that Bakie got out of the dozer in its logging operations. There was uncontroverted evidence showing that Bakie exacted approximately 2,200 hours of work from the dozer during approximately eighteen months. Various witnesses testified that the average number of hours put on this type of machine doing this type of work is between 1,200 and 1,500 hours per year. Bakie's use of the machine came out on the high end of those figures, at about 1,450 hours a year.

Based on the evidence in the record, we conclude that the trial court had substantial, although conflicting, evidence to conclude that the dozer was equipped with a logging package, as represented by Empire, and that Bakie obtained at least average use from the dozer in its logging business. Therefore, we hold there was substantial evidence to support the trial court's finding that Bakie failed to prove by clear and convincing evidence that Empire misrepresented the logging readiness of the dozer.

■ The district court found that Empire gave Bakie no express warranties on the dozer except for a "power train" warranty to be effective until June 15, 1987. Bakie claims that Empire misrepresented the fact that the dozer would come with other warranties in addition to the power train warranty. At trial, Mr. Bakie testified that he informed Empire's salesman, Brooks, that

he would not buy the dozer unless it came with a factory warranty, and that "he [Brooks] said that he could get me some warranties from the factory, he thought, if we could put a deal together." Mr. Bakie also testified that Brooks sat down with him and reviewed the provisions of the standard factory warranty, and that he understood that he would be getting such a warranty with the dozer, except that the power train portion of the warranty would be limited in duration to June 15, 1987.

Brooks' testimony regarding what was represented concerning warranties was substantially different from Mr. Bakie's testimony. Brooks testified that when Mr. Bakie inquired about a warranty on the dozer, he (Brooks) responded that because the dozer was used it would come with no warranty. When Mr. Bakie insisted that a dozer with so few hours on it should come with a warranty, Brooks went to ask Conger, Empire's co-owner and general manager, about the possibility of getting a factory warranty on the dozer. Brooks testified that Conger called Deutz–Allis' regional representative and received approval to give Bakie a power train warranty on the dozer which would expire on June 15, 1987. Brooks testified that he informed Mr. Bakie that he could have a power train warranty on the dozer until June 15, 1987, and that Mr. Bakie agreed to purchase the dozer with that warranty.

The trial court also had before it the standard warranty which Bakie claimed was applicable to the dozer. This standard factory warranty expressly states that it only covers new products, and the undisputed evidence at trial was that this was a used dozer, and that Bakie knew it was a used dozer at the time of purchase. Based on the evidence in the record, the trial court had substantial evidence upon which to base its finding that Empire did not misrepresent to Bakie that it would give Bakie any warranty other than the power train warranty.

■ Finally, Bakie claims that Brooks made a fraudulent misrepresentation when he stated that the winch on the dozer was like new; never having had a line on it. At trial, Mr. Bakie testified that when Brooks was showing him the dozer, Brooks "pointed out the winch on the back of the machine was just like brand-new and he doubted if there had ever been a winch line on it." Bakie further testified that the winch did look brand-new, that he interpreted Brooks' statement to mean that the winch was brand-new, and that he did not realize the winch was not brand-new until it was taken apart for repairs on May 29, 1986. Bakie also testified that on May 29, 1986, when he discovered that the winch was not brand-new, he had not yet purchased the dozer.

The most that Mr. Bakie's testimony establishes is that Brooks said the winch looked like it was brand-new and it looked like it had never had a line on it. Mr. Bakie himself testified that this was true. One of the essential elements of a claim of misrepresentation is proof that the representation was false. Mr. Bakie also testified that he knew the winch was not brand-new before he purchased the dozer, establishing the fact that whether the winch was brand-new or not was not material to Bakie's decision to enter the sales contract, another essential element of Bakie's claim. We conclude that this is more than substantial evidence to support the trial court's finding that Bakie failed to prove that Brooks made a material misrepresentation regarding the winch.

■ 2. *Finding of No Breach of Warranty.* On appeal, Bakie claims that the trial court erred in finding that Empire did not breach an implied warranty of fitness for a particular purpose.

Because, as we discussed above, the trial court had substantial, although conflicting evidence to support a finding that the dozer was, in fact, logging ready—fit for Bakie's particular purpose—we conclude that the trial court committed no clear error in refusing to find that Empire breached any implied warranty of fitness for a particular purpose.

■ 3. *Finding that the Dozer's Resale was Commercially Reasonable.* Bakie's final contention on appeal is that the

trial court erred in finding that Deutz–Allis' resale of the dozer was commercially reasonable. Idaho Code §§ 28-2-706 and 28-9-504 set forth the requirements for reselling repossessed collateral; imposing the general rule that the resale may be "at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." I.C. § 28-9-504(3). Pursuant to these code sections, Deutz–Allis was required to give Bakie reasonable notification of the time and place of the public sale so that Bakie would have an opportunity to bid or to secure the attendance of other bidders. *Id.*, I.C. § 28-2-706(4)(b) and Official Comment 8. Deutz–Allis was also required to hold the sale at a usual place or market for public sale; i.e., a place or market which prospective bidders may reasonably be expected to attend, as distinguished from a place where there is no demand whatsoever for goods of the kind. I.C. § 28-2-706(4)(b) and Official Comment 9.

At trial, Bakie presented evidence to show that the auctioneering company that conducted the auction in question was primarily in the business of auctioning farm equipment, with the auctioning of logging equipment constituting less than five percent of the company's business. The record also shows that the dozer was the only piece of non-farming equipment present at the auction in question; the remainder of the merchandize all being farming equipment. Mr. Bakie, who attended the auction but did not register as a bidder, testified that he thought only two persons bid on the dozer at the auction. Bakie also introduced evidence that the dozer was worth $40,000, however, this estimate of the dozer's value could not be fixed to any particular point in time. The expert who testified as to the dozer's value could not even remember the year when he saw the dozer and made this evaluation, but he stated that he saw the dozer at a Springdale job site. Mr. Bakie testified that he had the dozer on the Springdale job site in November, 1986, and that by the 15th of December, 1986, the dozer was on a different job site. The trial court could have

deduced from this evidence that Bakie's expert valued the dozer at $40,000 in November, 1986, six months after Bakie had purchased it, and over one year prior to the time the dozer was repossessed and sold at auction. The record also shows that the dozer was purchased at the auction by one Arnold Shiflet, a co-owner of Empire who owned the dozer prior to Bakie.

To establish that the dozer's resale had been conducted in a commercially reasonable manner, Deutz–Allis presented evidence to show the following: that after repossession of the dozer, Deutz–Allis placed the dozer for sale on the lot of Moscow Implement, a Deutz–Allis dealer in Moscow, Idaho, and advertized its resale to other Deutz–Allis dealers throughout the country; that Deutz–Allis also advertised the dozer in the Seattle Times; that when no private sale of the dozer had been realized after three months, Deutz–Allis decided to place the dozer for sale at public auction; that Mr. Bakie received notice of the time and place of the public auction; that the auction was advertized by handbills and in newspapers in Washington, Oregon, Idaho, and Montana; that handbills were also sent directly to numerous individuals and implement dealers; that prior to the auction, the dozer was appraised by Deutz–Allis to be worth between $15,000 and $30,000; that Deutz–Allis had determined to make a bid of $19,000 at the auction if the dozer did not bring what Deutz–Allis considered to be a reasonable price; that an expert witness for Deutz–Allis appraised the dozer approximately one year after the auction and testified that, in his opinion, at the time of the auction the dozer had a fair market value of $25,000; that over 500 people attended the auction, with 194 of them registered as potential buyers; that the potential buyers came from various states, including Idaho, Washington, Montana, Wyoming, Nebraska, and Nevada; that the bidding on the dozer was competitive; that the auction took place in an area where a great deal of logging was performed; that the auction took place at the Latah County Fairgrounds on May 14, 1988, and was conduct-

ed by Urban J. "Shorty" Arnzen, a professional auctioneer; and that the dozer sold at the auction for $24,000. The record also shows that Mr. Bakie made no objection to the time, place or manner of sale either prior to, or at the time of, the auction. The net proceeds of the sale, after deducting the auctioneer's commission and repossession costs, were $22,783.21, which amount was applied to the contract, leaving an unpaid balance of $47,965.70.

We hold that there was substantial, although conflicting, evidence to support the trial court's finding that the dozer's resale had been conducted in a commercially reasonable manner. Deutz–Allis gave Bakie prior notice of the time, place and manner of the public sale. The public sale was conducted in a place or market which prospective bidders were reasonably expected to attend. The bidding on the dozer was competitive, and the price obtained for the dozer was commensurate with the value of the dozer as estimated by various experts. Therefore, we conclude that the trial court's finding that the resale was commercially reasonable was not clearly erroneous, and we will not disturb it on appeal.

■ 4. *Finding that Repair of Winch was Under Power Train Warranty.* Empire argues on appeal that the district court erred in finding that Bakie was not liable for the winch repairs of July 29, 1986. The trial court found that the "July 29, 1986 winch repair was a covered repair under the 'power train' warranty as the same was reasonably understood by Bakie." We agree with Empire that there is no substantial evidence in the record to support the trial court's finding that Mr. Bakie reasonably understood the winch repairs to be covered under the power train warranty. At trial, Mr. Bakie was asked by his attorney whether the winch was part of the power train. In response, Mr. Bakie testified, "It's not. It's powered by the power train but but [sic] I'm saying it's not a part of the power train." While there is substantial evidence that Mr. Bakie was not certain as to the scope of the power train warranty, the record is clear that Mr. Bakie understood that the winch was not within the warranty's scope. Bakie has never asserted that the winch repairs should have been covered under the power train warranty, but consistently asserted that the damage to the winch was caused by Empire, and therefore Empire was responsible for repairing the damage.

■ Although we conclude that the district court's finding that the winch repairs were covered under the power train warranty was clearly erroneous, we do not reverse outright the district court's conclusion that Bakie properly refused to pay for the repairs. A district court's judgment that is based on erroneous grounds may be upheld on correct grounds. *Archer v. Mountain Fuel Supply Co.,* 102 Idaho 852, 853, 642 P.2d 943, 944 (1982).

■ A review of the record reveals substantial evidence to support the following facts. On or around July 22, 1986, Bakie had an Empire mechanic come to the job site where the dozer was being used to have him repair some pivot bolts on the dozer's track frame. At the same time the dozer operator showed the mechanic that the back of the dozer was leaking oil where the winch attached to the dozer. The mechanic observed the leak and said to go ahead and run the winch, that it wouldn't hurt anything, and that he would be back to fix whatever was causing the leak in a few days. The next day the winch broke off from the dozer, shearing the bolts that attached it to the dozer.

The record also contains substantial evidence to support a finding that the winch broke off from the dozer because Empire mechanics had failed to properly tighten the bolts when they remounted it on the dozer after performing previous repairs on it. Mr. Bakie testified that during the demonstration period he had pulled heavier loads with the winch than the load it was pulling at the time it broke off from the dozer. In between the demonstration period and when the winch broke off, Empire had taken the winch off of the dozer to perform other repairs on it. Empire's mechanic who observed the dozer leaking oil on July 22, 1986, testified that one reason why the dozer was leaking oil at that point

could have been because some of the bolts securing the winch to the dozer had not been properly tightened. This mechanic also testified that failure to properly tighten the bolts would have allowed some play in the winch's mounting, which could have resulted in the winch breaking off of the dozer while it was being used to drag timber.

At trial, Mr. Bakie testified that after the winch broke off of the dozer he took the dozer and the broken winch into Empire and told Brooks:

> [T]hat the winch had fell off the back of it and they couldn't have put it on there properly because winches don't do that, it just don't happen. It just don't happen. I have been around the logging business almost all my life. I ain't never seen a winch laying on the ground.
>
> . . . .
>
> [BY BAKIE'S COUNSEL]: So you explained that to them, what was the response of Mr. Brooks?
>
> MR. BAKIE: Well, he said we would have to get it in here and get it fixed and we'll figure out something on it. And the next thing I know I get a bill for around $4,000 that I owe Empire Machinery for fixing my winch.

Our Supreme Court has recognized that in the area of personal services there is an implied warranty that the services will be performed in a workmanlike manner. *Hoffman v. Simplot Aviation*, 97 Idaho 32, 37, 539 P.2d 584, 589 (1975). There is substantial evidence in the record to support a finding that Empire breached that implied warranty with respect to the initial repairs made on the winch, and that that breach caused the subsequent damages to the winch.

Idaho also recognizes the doctrine of quasi estoppel, which holds that a party may not maintain a position inconsistent with a position previously taken, if, by taking the previous position, the party has gained some advantage for itself, or produced some disadvantage to another party, or induced another party to change its position. *Dawson v. Mead*, 98 Idaho 1, 4, 557 P.2d 595, 598 (1976). In this case, there is substantial evidence showing that Empire initially took the position that it would work something out with Bakie with respect to Bakie's assertion that Empire was responsible for the damage. There is also evidence to find that, in reliance on this representation, Bakie turned the dozer and winch over to Empire, who then spent an inordinate amount of time repairing the machine, and charged Bakie $4,000, the full price of the repairs. We conclude that under either legal theory, warranty of workmanlike repairs or quasi estoppel, there is substantial, although conflicting, evidence in the record to support the trial court's finding that "Bakie properly refused to pay for the repairs."

5. *Finding that Empire was not Entitled to Attorney Fees.* The trial court concluded that both Bakie and Empire had prevailed in part and failed in part on their respective claims and defenses against each other. The court also found that neither Bakie nor Empire was a prevailing party under I.R.C.P. 54, for the purpose of awarding attorney fees, and accordingly refused to award fees to either party. I.R.C.P. 54(d)(1)(B), provides:

> In determining which party to an action is a prevailing party and entitled to costs, the trial court shall in its sound discretion consider the final judgment or result of the action in relation to the relief sought by the respective parties, whether there were multiple claims, multiple issues, counterclaims, third party claims, cross-claims, or other multiple or cross issues between the parties, and the extent to which each party prevailed upon each of such issue or claims. The trial court in its sound discretion may determine that a party to an action prevailed in part and did not prevail in part, and upon so finding may apportion the costs between and among the parties in a fair and equitable manner after considering all of the issues and claims involved in the action and the resultant judgment or judgments obtained.

Pursuant to this rule, the determination of who is a prevailing party, for the purpose of receiving an award of attorney fees, is

committed to the sound discretion of the trial court, and that determination will not be disturbed unless an abuse of discretion has occurred. *Decker v. Homeguard Systems,* 105 Idaho 158, 666 P.2d 1169 (Ct.App. 1983). We conclude that Empire has failed to establish that the district court abused its discretion in finding that Empire had prevailed in part and did not prevail in part, and was not entitled to an award of its attorney fees. Therefore, we will not disturb that finding on appeal.

## Conclusion

Although the record in this case contains conflicting evidence, we conclude that the trial court's findings are based on substantial evidence, and, therefore, we will not disturb those findings on appeal. Bakie is ordered to pay Empire's costs and Deutz–Allis' costs and attorney fees on Bakie's appeal. I.A.R. 40 and 41. Empire is ordered to pay Bakie's costs pertaining to Empire's cross-appeal. *Id.* No attorney fees are awarded to either Bakie or Empire on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.