732 P.2d 679

**ALUMET, a partnership, and John D. Archer and Elizabeth Archer, husband and wife, Plaintiffs-Counterdefendants-Appellants-Cross Respondents,**

v.

**BEAR LAKE GRAZING COMPANY, Defendant-Counterclaimant-Respondent-Cross Appellant.**

**Nos. 16066, 16257.**

Court of Appeals of Idaho.

Nov. 26, 1986.

Rehearing Denied Feb. 25, 1987.

Curt R. Thomsen (argued) and G. Lance Nalder (Holden, Kidwell, Hahn & Crapo), Idaho Falls, for appellants-cross respondents Archer.

L. Charles Johnson (argued) and Jesse C. Robison (Johnson, Olson, Robinson, Chartered), Pocatello, for appellants-cross respondents Alumet Group.

Herman J. McDevitt (argued) and Daniel P. McKernan (McDevitt, McDevitt & Meyers), Pocatello, for respondent-cross appellant Bear Lake Grazing Company.

WALTERS, Chief Judge.

This is a consolidation of two appeals in an action involving the parties to a mining lease.[1] The action began when Alumet sought a declaratory judgment recognizing its right to mine phosphate ore in Caribou County, Idaho, under a mineral lease between Alumet, the lessee, and Bear Lake Grazing Company, as lessor.[2] As part of the lease agreement, the lessee was to pay the lessor royalties based on the amount of ore removed from the mining site. After trial, the district court concluded that the lessee was in breach of the lease because of the lessee's failure to sufficiently mine the property. The court held that unless the lessee completed a court-determined amount of mining and paid the lessor the resulting royalties within thirty days, the lease would be terminated.

The lessee and the Archers, the lessee's predecessors in interest, appeal. The lessee raises issues concerning the court's decision finding the lease in breach, as well as several evidentiary rulings made by the court during trial. The Archers also challenge the court's decision as to the alleged breach of the lease agreement and urge that the lessor should have been estopped from claiming there was a breach of the lease. The lessor has cross appealed, raising as additional issues the district court's dismissal of the lessor's counterclaims based on malicious prosecution and abuse of process, the denial of certain proposed amendments to the judgment, and the district court's refusal to imply a covenant to develop. We affirm in part, reverse in part, and remand for further proceedings.

In 1964, the predecessors in interest of Alumet and Bear Lake entered into a lease agreement under which the lessee, Alumet, would develop a phosphate mine. The lease provided for an initial ten-year term, which later was extended to fifteen years. During this extended primary term the lessee was to pay rent of fifty cents per acre for 620 acres.[3] In addition to this yearly rental fee of $310, the lessee also agreed to pay royalties of twenty-five cents per ton for all phosphate ore removed from the leased lands. Under the lease the yearly rentals were deductible from the royalties due. The lease provided that if at the end of the extended primary term, the lessee was conducting mining operations and producing ore "so as to obligate [itself] to pay royalties to Lessors," the lease would be extended "for so long as Lessee shall continue to mine from the leased premises." The lease agreement required that the lessor provide written notice to the lessee for any default. It allowed a thirty-day cure period to correct any default.

The lessee extensively explored the phosphate deposits, but did not begin removing ore until 1978, just prior to the expiration of the lease's extended primary term in May 1979. The lessee mined the property from 1978 to 1983, removing enough ore to

---

1. The complaint and counterclaim in this action named numerous parties as plaintiffs and defendants. Moreover, the primary plaintiff and counterdefendant, Alumet, is a partnership comprised of several corporations. To reduce confusion and as a matter of convenience we have consolidated the captions appearing on the notices of appeal, to remove the names of some of the parties and to realign the parties involved in this appeal.

2. Alumet acquired its interest from J.D. Archer, the original lessee. Archer retained a residual royalty interest under the transfer to Alumet. Bear Lake Grazing Company acquired its interest from Bear Lake Stockmen's Association, Inc., the original lessor. For simplification we will refer to Alumet as lessee and Bear Lake Grazing Company as lessor.

3. The initial lease was for 580 acres, but this was later increased to 620 acres.

produce royalty payments of approximately $9,000 of which $1,860 represented six annual payments for rental fees on the land. In 1984, the lessor notified the lessee that the lease was to be terminated because of the lessee's "failure to properly conduct good faith mining operations upon the leased premises, thereby causing an abandonment and forfeiture of said Lease." The lessee then filed suit seeking a declaratory judgment that the lease was still in effect and not in breach.

Following trial, the district court ruled that the lease contained an express covenant to develop the mine, and that the language in the lease, requiring the lessee to "pay royalties" for ore removed in the secondary term, meant payment of "substantial royalties." The court found that the lessee and the lessor "expected that the lease would not continue in a secondary term unless it was profitable in a substantial way for both." The court found that the mining levels and royalties paid to the lessor in the secondary term had not been substantial, and therefore the lease was in default. However, the court ruled that proper notice of the default had not been given to the lessee. The court determined that the litigation regarding the lease was itself adequate notice to the lessee, and therefore pursuant to the lease, the lessee would be given thirty days after judgment in which to cure the default.

Based on figures developed in the case of *Archer v. Mountain Fuel Supply Company*, 102 Idaho 852, 642 P.2d 943 (1982), the court calculated an amount of ore that had to be mined and removed from the property, and the royalties to be paid, within the thirty-day period in order to cure the default. The court's calculation apparently was arrived at through the following process. The court found that the minable ore

body contained 21,100,000 tons. Under the lease, the lessor would ultimately receive twenty-five cents per ton, or $5,275,000, if the entire ore body was removed. The court then looked to *Archer*. In *Archer*, our Supreme Court was urged to impose an implied-in-law duty to mine and develop a mine, pursuant to a mining lease which did not contain an express covenant to actually mine or develop the property. The Supreme Court refused to imply such a duty in *Archer* because the lessor—through an initial payment for the lease plus minimum annual royalties—had received a "reasonably substantial return" in exchange for the lease. The Supreme Court noted that the amount received by the lessor over ten years was equivalent to six percent "of the most optimistic estimate of what their returns might be." 102 Idaho at 857, 642 P.2d at 948. The district court here applied the *Archer* six percent figure to the $5,275,000 (6% times 5,275,000 divided by 10 equals $31,650) and arrived at $31,650 in annual royalties which the court then ordered the lessee to pay to cure the default. The district court further ordered that the lessee actually mine the amount of ore commensurate with this royalty figure. If these requirements for curing the default were not satisfied in the thirty-day period, the lease would be terminated. With this factual background we turn to the pertinent issues raised by the parties.

## I

The lessee and the Archers' have challenged the district court's decision that the lease required mining levels sufficient to produce "substantial royalties" for the lessor. The lessor, on the other hand, urges that the court's finding of default may be upheld by implying a covenant to develop the mine.[4] All parties have briefed the

---

**4.** The lessor's reference to a covenant to develop is slightly misplaced. In the mining industry, the terms "to develop" and "to mine" denote two different stages in a mining operation. Development means the activity, following exploration, necessary to make a deposit accessible for extraction. *Santa Fe Pacific Railroad Company v. United States*, 378 F.2d 72 (7th Cir.1967). The

phrase "to mine" includes the operation, following exploration and development, by which usable materials are extracted from the earth. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1437 (1976); *Fremont Lumber Company v. Starrell Petroleum Co.*, 228 Or. 180, 364 P.2d 773 (1961). In the instant case, the lessee's activities establish that the exploration

question of whether an implied covenant should be recognized. In summary, we view this lease as being composed of two parts: (1) the primary term requiring a fixed rental payment, and (2) a second term requiring that mining occur in order to extend the lease past the primary term. From the district court's opinion, as well as the arguments of all parties, it appears that the problems which have arisen in connection with this lease deal only with the second term. As will be explained, we affirm the district court's ruling that the lease embodied a covenant to mine and that mining was required to extend the lease past the primary term. However, we reverse the district court's determination of what that level of mining should have been.

■ As an initial matter, we have concluded that the district court erred in determining that the lease contained an *express* covenant to develop. Our review of the lease discloses no expressly stated covenant to develop. Ordinarily, express covenants to develop promise "that development will proceed through certain stages within specified times or, alternatively, that specified sums will be expended during each period for exploration or development." 4 AMERICAN LAW OF MINING (Second) § 131.09[5][a] (1985). There are no provisions in this lease that detail or even mention such measures. Similarly, we note the lack of details that would provide the lessee relief from such a covenant in the event of unforeseen delays caused by such factors as market fluctuations, equipment breakdown or unavailability, and other *force majeure* circumstances. *Id.* Although we disagree with the district court about the existence of an express covenant, we believe that the district court's analysis does reflect the obvious conclusion that development of a mine was contemplated by the parties. The lease contains clauses dealing with payment of

royalties, with records showing quantities of ore removed, with mining "by strict mining methods," and with continuation of the lease. These provisions indicate that an ongoing mining operation was anticipated by the parties.

■ A noted authority, Pech, *Project Shut Down Or Slow Down: Agreement Clauses We Wish We Had (Or Didn't Have)*, 29 ROCKY MTN.MIN.L.INST. 241 (1983), discusses the basic reasons for implying a covenant to actively mine. One is to assure that the lessor's expectations of royalties are met. *Id.* Obviously, a lessor would not have entered into a lease giving up his right to develop or to mine potential mineral resources without receiving some consideration in return. In deciding whether to impose a covenant to mine, the courts look at such factors as the payments received, the length of the primary term of the lease, and the certainty of the presence of minerals. *Id.* The courts examine the payments to see if they are sufficient consideration to justify continuation of the lease. On the other hand, a short primary term is often included in a lease to stimulate rapid development and extraction of the ores. If the lease contains a long renewal term and does not provide for increasing periodic payments, minimal payments during the predevelopment stages will often lead to the implication of a development covenant. If minerals are known to be present, development and extraction are much more likely to have been anticipated than if the lease is given for purely speculative purposes. *Id.*

■ Looking at these factors in the context of the present case, the payments made by the lessee to the lessor, including six years' rentals, totaled approximately $8,900. These payments resulted from the guaranteed returns of $310 per year from rentals plus a royalty of twenty-five cents

---

and development stages had been completed, and, at the time this action was instituted, the lessee was in the process of mining by actively extracting minerals. However, for the purpose of our analysis, the distinction between development activity and mining activity makes little

difference, because—as we note later in this opinion—both activities are measured by the same standard, *i.e.*, whether the lessee conducted its activities prudently in good faith and with reasonable diligence.

per ton on all ore removed. However, it is an important consideration that the rental fees were deductible from future royalties. In examining these guaranteed "rental" payments, we must conclude that the term "rental" should not necessarily be given its commonly accepted definition in situations like this where the fee is deductible from future royalties. The rental is in effect an advance, minimum royalty. 4 AMERICAN LAW OF MINING (Second) § 131.06 [4] (1985). Other factors also support the implication of a covenant to mine in this case. The presence of a large ore body was reasonably certain. There was no provision in the lease for escalating periodic payments. The extended primary term of the lease was fifteen years, with a provision that could result in a lengthy renewal term. Although the evidence showed that the mine was expected to produce for thirty years, the district court noted that, at the rate royalties were being paid to the lessor, the lease had a potential life span of 3,800 years.[5] Thus, under the lessee's interpretation of the lease, the lessee could have mined indefinitely, and the lessor would have recovered only minute fractions of the potential returns under the lease. We therefore conclude that this a proper case for implying a covenant to develop and actively mine. In fact, the district court's conclusion that development was expressly required, plus a determination of what that development entailed, leads to a result that is equivalent to implying a covenant to develop and to mine the property. Therefore, even though the district court used different terminology, it, in effect, did imply a development and mining covenant.

This covenant, in the district court's view, required "substantial" mining.

As mentioned earlier, the district court, faced with the task of quantifying "substantial" mining, turned to *Archer*. There the Supreme Court held that a six percent return on anticipated profits was sufficient compensation to forego imposition of an implied covenant. However, *Archer* did not hold that a six percent return represented "substantial" mining. Here, the district court applied the six percent figure to the Bear Lake lease without any indication of why it decided that six percent was appropriate in this case. We conclude that, insofar as the six percent figure is concerned, *Archer* does not control this case.

More fundamentally, we think the district court created a quandary by postulating an obligation to engage in "substantial" mining. "Substantial mining" under certain conditions might not be "substantial mining" under different conditions. The quantity of ore removed necessarily reflects the particular situation under which any given lessor and lessee are operating.

■ All authorities we have found agree that when implied covenants to develop or to mine are imposed, the lessee's actions will be judged under a good faith standard—often described in terms such as reasonable diligence, due diligence, ordinary diligence or ordinary prudence. In other words, the court will compare the lessee's actions with those of a reasonably prudent, similarly situated businessman.[6] The sufficiency of the work under the lease is determined by looking at the specific facts and circumstances of each case.[7] The quantity

5. The district court's estimate of the life span was in error because the court had misjudged the size of the ore body to be approximately 46 million tons. The court later concluded that the ore body was only 21.1 million tons. Allowing for the court's initial miscalculation, the potential length of the lease was still more than 2,000 years.

6. Annotation, *Payment Of Stipulated Minimum Royalties or Annual Rental Under Solid Mineral Lease As Precluding Lessor's Claim Of Forfeiture or Abandonment*, 87 A.L.R.2d 1076 (1963); Annotation, *Implied Obligation of Purchaser or Les-* *see to Conduct Search For, or To Develop or Work Premises For, Minerals Other Than Oil And Gas*, 76 A.L.R.2d 721 (1961); Annotation, *Duty of Lessee or Purchaser of Mineral Rights Other Than Oil or Gas As To Development And Operation*, 60 A.L.R. 901 (1929).

7. Annotation, *Implied Obligation of Purchaser or Lessee To Conduct Search For, or To Develop or Work Premises For, Minerals Other Than Oil And Gas*, 76 A.L.R.2d 721 (1961).

of ore removed is simply one of the factors to be considered in deciding whether the lessee's actions have been reasonable. Obviously, this theory is similar to the well-known rule that good faith and and fair dealing are implied obligations of every contract. We note that the district court *concluded* that the lessee had not been reasonably prudent in developing the mine or in mining the property. However, the court failed to make any *findings* which would sustain that conclusion. Thus, we find it necessary to reverse the judgment on the question of the level of mining required under the lease and whether that level had been achieved.

The district court is directed on remand to recognize an implied covenant to mine under in the lease. On remand the court should (1) determine what level of mining would have been conducted in good faith by a reasonably prudent operator, and (2) make factual findings supporting that conclusion. The district court is at liberty to make this determination on the trial record as it presently exists, or, within its discretion, to allow the parties to present further evidence on the question. Having made this determination, the court should specify the amount of mining and royalty payments required to cure a breach of the lease.

## II

In addition to its challenge regarding the payment of substantial royalties, the lessee raises two evidentiary issues. First, it contends the court erred in admitting parol evidence to interpret and explain the written lease. Second, the lessee asserts the court erred by admitting testimony of a negotiated agreement in a related case.

The parol evidence in question was testimony dealing with the overall extent of the development of the leased properties. The lessee objected to questions dealing with matters such as the lessee's willingness to go into full production of the mine and the acquisition and development of a processing-plant site. Other testimony dealt with quantities of ore to be mined, the life ex-

pectancy of the mine, availability of financing for the mining operation, the stockpiling of ore, and time schedules. The district court repeatedly overruled the lessee's objections to this testimony about development and mining.

 We note that the parol evidence rule does not prohibit evidence of consistent additional terms if a writing is not a complete statement of the agreement. *Farnes v. Grover,* 106 Idaho 752, 682 P.2d 1299 (Ct.App.1984). Here, the lease agreement did not explicitly deal with the extent of development and mining. Information relevant to the extent of development and mining required under the lease, coming from outside the four corners of the lease agreement, was necessary to resolve the issue concerning the alleged covenant to develop and to mine. We have reviewed the challenged testimony and conclude that the district court did not err in admitting the questioned testimony.

 The lessee's other objection concerns the admission of certain statements about negotiations in a related case involving the lessee's acquisition of a site for a phosphate processing plant. The judge noted that testimony had been presented suggesting that the lessor was responsible for the delay in constructing the plant. In overruling the lessee's objection, the district judge noted that the "negotiation" testimony was being admitted for the limited purpose of clarifying what factors caused the delay in the building of the processing plant. We have reviewed the challenged statements, and we find no error in the court's admission of that testimony.

## III

The Archers raise as additional issues (1) the failure of the court to consider economic, competitive and environmental factors in its decision, and (2) the court's failure to hold that the lessor was estopped from asserting a breach of the lease. As to the first issue, these factors are related to the lessee's reasonableness in developing and

mining. As noted previously, when a court implies covenants to develop or to mine, the lessee is held to a "reasonably prudent" standard. Thus, these factors would be relevant in considering whether the lessee had met that standard. We have already acknowledged that the district court concluded that the lessee had not been reasonably prudent. The district court specifically noted that it had considered these factors in making that determination. Thus any allegation that the court had not considered them is without merit. However, the lack of any findings supporting this conclusion becomes crucial in our review. On remand, the district court proceedings required under Part I of this opinion will necessarily take note of these factors. Thus, we need not address this issue further.

■ The district court did not rule specifically on whether the lessor should be estopped from claiming a breach of the lease. Yet by the court's very holding, a negative response to this contention is apparent. The thrust of the Archers' argument is that because the lessor sold property to the lessee to build a processing plant, at least in part to process ore from the Bear Lake lease, the lessor should not now be allowed to claim the lease has been breached. We are unpersuaded by this argument. While the questions related to the viability of the lease and the acquisition of a plant site are related, they are not interdependent. The lessor has not asserted that the lease itself is invalid, but rather that the lessee has not performed as required by the lease. We also find it significant that, in respect to the site purchase, it was the lessee who sought enforcement of that sale—as opposed to the lessor insisting that the lessee buy the site. Had the lessor sought to compel the plant site purchase, perhaps an argument for estoppel would be more persuasive. Under the facts as they now appear, however, the Archers' argument for estoppel is without merit.

## IV

Finally, the lessor raises three additional issues on appeal: (1) the court's refusal to imply a covenant; (2) the court's denial of the lessor's motion to amend or alter the judgment; and (3) the dismissal of the lessor's counterclaims based on malicious prosecution and abuse of process.

■ Part I of this opinion resolves the lessor's assertions as to implying a covenant. Therefore, we turn to the lessor's second issue, the denial of the motion to alter or amend the judgment. The lessor contends that the lease agreement created "an estate on special limitation" under which the lease would automatically terminate, without notice and opportunity for cure, upon the lessee's failure to mine regardless of notice to the lessee. We agree, however, with the district court's interpretation of the lease agreement where the court held that automatic termination would not be appropriate in the absence of abandonment of the lease. The evidence is clear that some mining activity had been taking place on the leased lands. There is a clear distinction between a complete failure to mine and a failure to mine at a level sufficient to extend the lease. The lease expressly required thirty days notice to cure any default. Such a provision is inconsistent with a theory that the lease allowed automatic termination without notice to the lessee. The district court did not err in denying the lessor's motion to alter or amend the judgment.

■ We address next the dismissal of the lessor's counterclaims. Prior to trial, the lessee obtained a "Temporary Restraining Order" (TRO) which prohibited the lessor from terminating the lease or from interfering with the lessee's mining operation. This TRO was later dissolved *nunc pro tunc* by the district court. As a result of the issuance of the TRO, the lessor filed counterclaims against the lessee and against the lessee's counsel individually for malicious prosecution and abuse of process. The district court, prior to deciding the question of the viability of the lease, dismissed those claims without prejudice.

The lessor asserts on appeal that dismissal of its counterclaims was error. We disagree.

A judge has discretionary authority to consolidate claims or to consider them in separate actions. Here, the district judge's opinion indicates that he thoroughly considered not the *validity* of the claims themselves, but rather the *impact* of ruling on those claims prior to a resolution of the lessee's declaratory judgment action on the viability of the lease. The district judge pointed out that proceeding with the abuse of process and malicious prosecution claims prior to a decision on the declaratory judgment action would have serious impacts on the declaratory judgment action. The district judge concluded, and we think properly so, that a ruling could be made on the counterclaims independently without conflicting with a decision on the declaratory judgment claims. However, proceeding with the abuse of process and malicious prosecution claims would require the lessee's attorney, because of ethical considerations, to withdraw from representing the lessee and thus deprive the lessee of its choice of counsel. More importantly, noted the court, was the possibility that privileged matters between the lessee and its attorneys might have to be revealed as part of the abuse of process and malicious prosecution actions. Disclosure of this information could jeopardize the lessee's position in the declaratory relief action. The district judge pointed out that subsequent proceedings on the abuse of process and malicious prosecution claims were still available to the lessor, and that dismissal of the counterclaims did not indicate any predisposition of the court as to the validity of the claims. We conclude that the district judge's dismissal of the lessor's counterclaims, without prejudice, did not represent an abuse of discretion.

In summary, the decision of the district court concluding that the lease embodies a covenant to engage in mining is affirmed. However, that part of the decision determining what constitutes "substantial" mining is reversed and the case is remanded. On remand, the district court is directed to (1) determine what level of mining was required to satisfy this covenant, and (2) to make factual findings supporting that conclusion. The lessee, upon conducting the court-determined amount of mining, and paying the resultant royalties within the cure period, will preserve its right to mine under the lease. The district court's decisions concerning evidentiary issues, amendments to the judgment, dismissal of claims for abuse of process and malicious prosecution, and estoppel are affirmed.

Case remanded. No attorney fees or costs on appeal.

BURNETT, J., and McFADDEN, J. Pro tem, concur.

### UPON DENIAL OF PETITIONS FOR REHEARING

BURNETT, Judge, concurring specially.

The Court today has voted to deny petitions for rehearing filed by appellant Alumet and respondent Bear Lake Grazing Company. The Court adheres to its unanimous opinion authored by Chief Judge Walters. I write separately today because I believe that a point raised by Bear Lake in its cross-appeal, and urged again in its petition for rehearing, deserves further comment. I refer to Bear Lake's contention that the lease automatically terminated, without notice, when Alumet allegedly breached it.

As noted in the Court's lead opinion, the lease provided in pertinent part as follows:

> If at the end of the primary term of this lease, Lessee is conducting mining operations upon the leased premises and is producing ore therefrom so as to obligate himself to pay royalties to Lessor, the term of this lease shall be extended, and this lease shall continue to be fully operative for so long as Lessee shall continue to mine. . . .

Provisions of this kind commonly are called "habendum" or "thereafter" clauses. By the express terms of this habendum clause, the lease would have expired if no mining

operations had been under way when the primary term ended.

In his well-written briefs, Bear Lake's counsel cites cases supporting the proposition that such expiration would be automatic, eliminating any requirement that Bear Lake exercise a lessor's right of reentry. *See, e.g., Dethloff v. Zeigler Coal Co.,* 82 Ill.2d 393, 45 Ill.Dec. 175, 412 N.E.2d 526 (1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 299 (1981) (lessee produced no coal during the primary term of lease); *Fremont Lumber Co. v. Starrell Petroleum Co.,* 228 Or. 180, 364 P.2d 773 (1961) (lessee undertook no activity on leasehold until several days before expiration of primary term). By analogy, the lease also would have terminated of its own accord if Alumet had ceased mining and had abandoned the leasehold. *See W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27 (1929). Bear Lake correctly asserts that the "so long as" phrase in the lease creates an express "estate upon special limitation" which terminates automatically when the lessee ceases to mine. *See* R. CUNNINGHAM, W. STOEBUCK, & D. WHITMAN, THE LAW OF PROPERTY §§ 2.4–2.5 (1984). *See generally* 4 AMERICAN LAW OF MINING § 132.07[2] (2d ed. 1984).

However, Alumet did not breach the *express* provisions of the lease. To the contrary, Bear Lake has conceded that Alumet mined some 5,000 tons of ore and paid royalties before the end of the primary term. Bear Lake also concedes that Alumet has mined ore and has paid royalties each year during the extended term. In a narrow, literal sense, the lease has been satisfied. Nevertheless, Alumet may have breached a broader, *implied* covenant to mine the premises actively—that is, to produce at the level which a reasonably prudent operator, acting in good faith, would achieve. Placed in this context, the real question presented by Bear Lake is whether breach of an implied term results in automatic termination of the lease.

The Court's lead opinion, relying on language in the lease itself, concludes that termination was not automatic. Paragraph 10 provides that "[i]f the Lessee shall fail to comply with any of the provisions of this agreement, *and such default shall continue for thirty days after service of written notice* thereof upon him by the Lessor, the Lessor may institute ... proceedings ... for the forfeiture and cancellation of this lease." (Emphasis added.) This provision is facially inconsistent with Bear Lake's assertion of an automatic forfeiture. But that is not the end of the issue. Bear Lake argues that the notice requirement does not displace the habendum clause. Moreover, a notice requirement pertaining to breach of an express provision of the lease does not necessarily carry over to breach of an implied covenant. Accordingly, Bear Lake would have us hold that the implied covenant is not subject to a notice requirement.

Bear Lake cites *Dethloff v. Zeigler Coal Co., supra,* and *Fremont Lumber Co. v. Starrell Petroleum Co., supra,* in support of its position. In my view, those cases are inapposite here. Both discuss the application of a notice requirement where the lessee has failed to satisfy the *express* terms of an habendum clause. Moreover, each case involves a failure by the lessee to achieve *any* mineral production by the end of the primary lease term. Indeed, the *Dethloff* court stated that "[h]ad production begun within the primary term but been thereafter halted the lease would not have terminated automatically, but, instead, the plaintiffs would have been required under the terms of the lease to demand performance, and if the demand were to no avail, then to reenter the property...." 45 Ill.Dec. at 181, 412 N.E.2d at 532.

I submit that forfeiture without notice or opportunity to cure is not an appropriate remedy for breach of an implied obligation. The need for notice is especially compelling in a case, such as this one, where the implied obligation embodies an element of reasonableness. The standard of a reasonably prudent operator is imprecise. The parties may have genuinely differing perceptions as to the reasonableness of certain

conduct. Fairness requires that a dispute over reasonableness be framed by notice, and that the lessee be afforded an opportunity to cure any deficiency in its performance, before a forfeiture is deemed to occur. Notice also may serve the objective of efficiency. In many cases notice will stimulate greater efforts by the lessee, thereby avoiding costly litigation.

Other courts have expressed similar views. In *Cameron v. LeBow*, 338 S.W.2d 399 (Ky.1960), the lessee failed to drill for oil in a portion of the leasehold. The lessor sought to terminate the lease for breach of an implied covenant to develop. The court held that no lessor could exercise its right of forfeiture based on the breach of an implied obligation without giving notice to the lessee that he should remedy the breach or face a forfeiture. The court further explained that, "[s]ince the ground of forfeiture is not found in the terms of the lease, cancellation is not automatic and may be accomplished only through judicial action." 338 S.W.2d at 405. *See also Superior Oil Co. v. Devon Corp.*, 604 F.2d 1063 (8th Cir.1979).

Forfeiture itself is a topic of debate. Not all courts permit forfeiture as a remedy for breach of an implied covenant to develop a mineral leasehold. *See* Annot., *Mineral Rights—Duty to Develop*, 76 A.L.R.2d 721, § 5 (1961). For example, the Texas Supreme Court will imply a duty to develop but generally will limit the remedy to an award of monetary damages or to an order compelling specific performance. *W.T. Waggoner Estate v. Sigler Oil Co.*, *supra*. As this Court's lead opinion indicates, we do not agree with *Waggoner* that forfeiture is unavailable. But our willingness to countenance a forfeiture must be accompanied by insistence upon notice and an opportunity to cure. These fundamental safeguards are especially appropriate where, as here, the parties have bargained for similar protections in the event that contain express terms of the lease are breached. Such safeguards balance the competing interests of the lessor, who desires the most productive use of the property, and the lessee, who seeks to protect an investment in acquisition and preliminary development of the leasehold. For these reasons, I join the Court in holding that the implied covenant in this case is subject to a notice requirement and an opportunity for cure.