812 P.2d 286

**ALUMET, also known as Alumet Company; Southwire Company; National Steel Corporation (now National Intergroup, Inc.), and Earth Sciences, Inc., the partners of Alumet, Plaintiffs–Appellants–Cross Respondents,**

v.

**BEAR LAKE GRAZING COMPANY, Defendant–Respondent–Cross Appellant.**

**BEAR LAKE GRAZING COMPANY, Counterclaimant–Respondent–Cross Appellant,**

v.

**NATIONAL STEEL CORPORATION, Earth Sciences, Inc., and Southwire Company, partners doing business under the firm name of Alumet, also known as Alumet Company, Counterdefendants–Appellants–Cross Respondents,**

**and**

**John D. Archer and Elizabeth Archer, husband and wife, Counterdefendants–Appellants–Cross Respondents.**

Nos. 17212, 17219, 17316 and 17655.

Court of Appeals of Idaho.

Aug. 17, 1989.

Petition for Review Granted Nov. 17, 1989.

L. Charles Johnson (argued), and Jesse C. Robison (Johnson Olson Robison, Chartered), Pocatello, for plaintiff-appellant-cross respondents Alumet.

Curt R. Thomsen (Holden, Kidwell, Hahn & Crapo), Idaho Falls, for counterdefendants-appellants-cross respondents Archer.

Herman J. McDevitt (argued), and Jerry R. Meyers (McDevitt & Meyers), Pocatello, for defendant-respondent-cross appellant.

BURNETT, Judge.

These consolidated appeals arise from a long and bitter dispute over a phosphate mining lease in eastern Idaho. We previously examined the controversy in *Alumet v. Bear Lake Grazing Co.*, 112 Idaho 441, 732 P.2d 679 (Ct.App.1986) (*Alumet I*). There, we held that the controlling question was whether the lessee had satisfied an implied covenant to engage in active mining. On remand, the district court found that the lessee had failed to do so.

The court adjudged the lessee to be in default and specified the performance necessary to effect a cure. Today we affirm that judgment, together with orders entered while these appeals were pending.

Our opinion consists of three parts. First, we summarize the background facts, our decision in *Alumet I* and the course of the litigation on remand. Second, we address the factual and legal issues raised concerning the implied covenant. Finally, we discuss the postjudgment orders which have been challenged on appeal.

## I

The underlying facts are complex. They were presented below in numerous hearings. The district court received 84 exhibits and compiled ten volumes of clerk's record or reporter's transcript. Although the parties' capable attorneys have endeavored to make the case digestible on appeal, the briefs encompass more than two hundred pages—in addition to the briefs previously filed in *Alumet I*. Accordingly, in the discussion to follow, we focus only on the most salient facts.

## A

In 1964, John D. Archer and his wife entered into an agreement with the Bear Lake Stockmen's Association for a lease of certain property owned by the Association. Archer intended to develop a phosphate mine. In 1974, he assigned the lease to Alumet, a partnership consisting of several large national corporations. Archer retained, in trust for his daughter, a right to royalties beyond those paid to the Association. Eventually, the Association evolved into the Bear Lake Grazing Company. Thus, the ultimate alignment of the parties was Bear Lake as the lessor, Alumet as the lessee, and Archer as the predecessor lessee with a residual interest in the leasehold.

The lease initially provided for a ten-year primary term, which later was extended to fifteen years. It required the lessee to pay an annual base rent of $310 and a royalty of $.25 per ton for all ore removed. Because the yearly rent was deductible from the royalties, it was actually a royalty advance. The lease provided that if at the end of the extended primary term, the lessee was conducting mining operations and producing ore "so as to obligate [itself] to pay royalties to Lessors," the lease would be extended "for so long as Lessee shall continue to mine from the leased premises." The lease required the lessor to provide written notice of any default, and it allowed a thirty-day period for cure.

Until 1978, Archer and Alumet conducted exploratory studies but extracted no ores and paid no royalties other than the annual minimum of $310. From 1978 to 1983, Alumet engaged in a meager level of mining; the royalty payments totaled only about $9,000 during this entire period. In 1984, Bear Lake decided the lease had not been performed in good faith. Bear Lake served a notice of termination upon Alumet. In response, Alumet filed this suit, seeking a declaratory judgment that it was entitled to remain in possession under the lease. Bear Lake counterclaimed for a declaration of forfeiture and for other relief.

At trial, the district judge ruled that the lease contained an express covenant to develop the mine and to generate "substantial" royalties. The judge found that the leased property contained a known ore body of 21,000,000 tons, representing $5,275,000 in potential royalties at $.25 per ton. The judge then drew an analogy to *Archer v. Mountain Fuel Supply Co.*, 102 Idaho 852, 642 P.2d 943 (1982). In that case, our Supreme Court described as "substantial" a lessor's receipt, over a ten-year period, of royalties equal to six percent of the estimated royalty value of an ore body. Based on this analogy, the judge held in the present case that Bear Lake was entitled to at least 0.6% annually of the royalty value of $5,275,000—that is, $31,650 per year. The judge gave Alumet thirty days to cure its default by mining sufficient ore to generate $31,650 in royalties. All parties appealed the judgment, leading to our decision in *Alumet I*.

## B

We held in *Alumet I* that the district court had erred in postulating an express

covenant to generate "substantial" royalties by active mining. No express language in the lease supported that determination. We also disapproved the flawed analogy to *Archer.* Nevertheless, we observed that "the district court's analysis does reflect the obvious conclusion that development of a mine was contemplated by the parties." 112 Idaho at 445, 732 P.2d at 683. We held that the lease contained an *implied* covenant to mine the premises actively. The case was remanded to the district court for a specific determination of the level of mining required by this implied covenant. We also instructed the judge to fix a reasonable time for a cure if he found that Alumet had defaulted by failing to satisfy the implied covenant.

The district judge found the implied covenant to be more rigorous than the postulated express covenant. Upon evidence that Alumet had contemplated extracting at least one million tons of ore every year, the judge quantified the implied covenant at one million tons annually. Finding that Alumet's performance had been deficient, he allowed one year for a cure. During this period, Alumet would not be required to remedy any prior shortfalls, but would be required to meet the million ton obligation.

Judgment was entered on October 23, 1987, triggering a cure period that would end in October, 1988. All parties appealed. Alumet asserted that a one million ton obligation was too much. Bear Lake contended that one year was too long. Archer, facing an economic loss if the lease were terminated, took sides with Alumet. The appeals by Alumet and Archer were docketed as numbers 17212 and 17219, respectively. Bear Lake's cross-appeal was filed under both numbers.

### C

The district court entered its judgment on remand without a second trial. The parties had agreed to re-submit the case on the existing evidence and on additional briefs. However, the parties became embroiled in disputes on other procedural matters. Approximately one month before entry of the October 1987 judgment, Bear Lake sought and obtained a temporary restraining order (TRO) preventing Alumet from extracting any ore unless it provided a full accounting and refrained from cutting timber or destroying fences. Upon learning that the judge had issued the TRO, Alumet moved unsuccessfully to disqualify him in all further proceedings. Approximately two weeks later, after conducting a hearing, the judge issued a preliminary injunction that actually relaxed many of the restrictions contained in the TRO. Nevertheless, Alumet continued to feel aggrieved by the TRO proceedings and by the judge's refusal to disqualify himself. Alumet eventually raised these points as issues in its appeal from the October 1987 judgment.

The case became even more contentious after the October 1987 judgment was entered. In November, Bear Lake moved the district court to enter an order under I.A.R. 13 for "preservation of property and effectiveness of judgment," pending the appeals filed by Alumet and Archer. Bear Lake contended that Alumet should not be allowed to engage in mining while the appeals were pending, unless it was making a good faith attempt to cure the default. Bear Lake was concerned that Alumet would extract less than one million tons and then vacate the premises without a full accounting and without reclaiming the land in a good "minerlike" fashion. Rather than simply objecting to Bear Lake's motion, Alumet filed its own "motion to strike." The district court denied this motion and reserved a ruling on Bear Lake's motion until a later date. From the order denying its "motion to strike," Alumet filed a separate appeal, which eventually was docketed as number 17316.

In 1988, while all these appeals were pending, Alumet submitted to our Court a "special imploration" for "extraordinary directives," instructing the district court to postpone the effect of the October 1987 judgment and to refrain from entering any further postjudgment orders. We denied this "special imploration," noting that Alumet had not sought a stay of the judgment

and that if the district court entered a postjudgment order by which Alumet felt aggrieved, it could seek proper review in our Court.

At about the same time, the district court, upon being reminded that it had not yet disposed of Bear Lake's Rule 13 motion, entered an order directing Alumet to refrain from mining unless it posted a bond, deposited the net proceeds of ore extraction with the district court, or supplied a detailed plan showing how it would attempt in good faith to cure the default by meeting the one million ton requirement. Alumet elected to deposit the net proceeds with the district court, but it also filed yet another appeal, eventually docketed as number 17655, from the district court's order.

Alumet later filed a Rule 13 motion of its own, asking the district court to stay the October 1987 judgment. The court denied the motion, noting that it had been filed with only a few weeks left in the cure period. The judge commented that a stay at that time "would not have any impact one way or the other." Alumet then moved this Court to enter such a stay, and Bear Lake objected. The motion has remained pending until the present time. Meanwhile, the parties have stipulated to submit appeal number 17655 on the briefs, consolidating it with the other three appeals. We approved this consolidation in 1989.

## II

We now turn to appeals 17212 and 17219, in which Alumet and Archer have attacked the October 1987 judgment. As noted earlier, Bear Lake has cross-appealed from the judgment, maintaining that one year is an unduly long period to cure a default under the implied covenant. However, for reasons that will become apparent, we need not reach that issue today. The other issues, raised by Archer and Alumet, relate to the quantity of mining required by the covenant. For ease of expression we will discuss these issues as though they had been framed singularly by Alumet.

In *Alumet I,* we noted that a fundamental reason for an implied covenant is to assure that the lessor's expectations of royalties are met. 112 Idaho at 445, 732 P.2d at 683. "Where the principal consideration to the lessor is his expectation of receiving royalties, there is an implied obligation on the part of the lessee diligently to explore, develop, and work (mine) the premises so that the lessor may obtain the expected income that induced him to grant the lease." Annot., *Mineral Rights—Duty to Develop,* 76 A.L.R.2d 721, 725 (1961); *see also* Adams, *The Implied–In–Law Covenant to Develop and Mine in Hard Mineral Leases,* 19 IDAHO L.REV. 633, 635 (1983) (noting that "[i]t is the lessor's expectation interest which is being protected by the implied-in-law covenant to develop").

This does not mean, of course, that the lessee is forced to satisfy the lessor's subjective anticipation of revenue. Neither is the lessor forced to accept a level of mining activity dictated by the lessee's subjective impression of its own self-interest. Rather, the law imposes an objective standard of reasonableness. The lessee must perform with reasonable diligence, taking those actions which would be expected of a reasonably prudent, similarly situated business person. *Alumet I,* 112 Idaho at 446, 732 P.2d at 684. Our formulation of the duty is in accord with that expressed by the Texas courts: "[T]he general duty of the lessee [is] to conduct operations as a reasonably prudent operator would on that particular lease in order to carry out the purpose of the lease in question." *United States Steel Corp. v. Whitley,* 636 S.W.2d 465, 471 (Texas Ct.App.1982); *see also Amoco Production Co. v. Alexander,* 622 S.W.2d 563 (Texas 1981).

### A

■ Having this standard in mind, we will address Alumet's contention that the district court erred in finding that a reasonably diligent operator would extract and remove one million tons per year. This is a factual question. As we stated in *Alumet I,* "[t]he sufficiency of the work under the lease is determined by looking at the spe-

cific facts and circumstances of each case." 112 Idaho at 446, 732 P.2d at 684 (footnote omitted). We will not overturn the district court's finding unless it is clearly erroneous. I.R.C.P. 52(a).

Alumet contends that the court committed such clear error because its ultimate finding on the required level of mining was based on subsidiary findings of fact unsupported by the record. In particular, Alumet challenges the court's findings as to reasons for the lack of vigorous mining and as to the feasibility of mining one million tons of ore per year under prevailing economic, environmental and competitive conditions. We will address these findings in turn.

The judge carefully reviewed the evidence concerning Alumet's failure to do more than minimal mining up to 1984. He pinpointed the critical problem as Alumet's inability to establish a sizable market for its product. Apparently, Alumet had been attempting to sell raw or "spot" ore. However, the undisputed evidence at trial demonstrated that the "spot" ore market was limited and extremely undependable. Most producers refined the ore through a process known as calcining and beneficiating before selling it.

Alumet had intended to do so as well. The judge found that in 1976 Alumet informed Bear Lake representatives that it planned to build a processing plant and to process one million or one and one-half million tons of ore each year. The plant did not materialize. Alumet blamed Bear Lake, claiming that it had obstructed the sale of a separate tract of land on which to locate the refining plant. When a sale finally was consummated in 1980, Alumet again represented that upwards of one million tons of ore would be mined and processed through the plant each year. Again, the plant failed to materialize. This time, Alumet blamed a severe economic recession from 1981 to 1983. Notwithstanding Alumet's protestations, the judge found that other phosphate mining companies in southeastern Idaho had made capital investments from 1974 through 1984. He noted that Alumet never had used the

leased ore body as collateral to obtain the necessary investment funds. Accordingly, the judge determined that Alumet's minimal performance under the lease was due to undercapitalization of the enterprise. Having reviewed the record in depth, we believe the judge's findings are supported by substantial evidence.

The judge also weighed the economic, environmental and competitive conditions affecting this lease. As we have noted, the judge acknowledged the existence of a recession but found that other companies in southeastern Idaho had continued to invest in their mining operations. Regarding environmental conditions, the judge was aware that heavy vehicle access to the Bear Lake site was restricted. Alumet's witnesses claimed that an existing road could not accommodate the traffic necessary to move large quantities of ore from the leased premises by truck. However, the judge noted that the transportation system could be enhanced by road improvements, by a slurry, or by other methods. Regarding the competitive business climate in which Alumet operated, the judge acknowledged that Alumet was a relative newcomer to southeastern Idaho. It had no established product distribution system. However, the judge aptly noted that Alumet was aware of this circumstance when it acquired the lease from Archer.

In our view, the judge's findings on economic, environmental and competitive factors were supported by the record. We think the judge also correctly perceived good faith to be part of the lessee's duty. In *Alumet I* we characterized reasonable prudence as a "good faith standard." 112 Idaho at 446, 732 P.2d at 684. On remand the judge said:

In determining the good faith of Alumet, their decision not to proceed with construction of a processing plant and consequently their lack of a commercial market, must be considered. The substantial capital investment by others, in spite of an imperfect economy[,] took place. Economic difficulties alone should not excuse development and mining. The implied covenant may not specifically dic-

tate that Alumet make substantial investment in capital for construction of a processing plant in all circumstances. But if the realities of the industry known to them in accepting the lease assignment from Archer are such that commercial development is not realistic without developing a processing plant, their failure to develop the market also speaks to good faith.

Based on these observations and on the findings discussed above, we uphold the judge's ultimate finding that a reasonably prudent lessee, operating in good faith to effectuate the purpose of the lease, would have reached a production level of one million tons annually by the time this case was tried.

**B**

Alumet next argues that even if the judge's findings are not clearly erroneous in fact, they must be set aside because they are tainted by errors of law. First, Alumet contends, the findings are based in part on inadmissible evidence regarding Bear Lake's subjective expectations of mine production. Second, the findings reflect a misallocation of the burden of proof as it relates to the breach of an implied covenant. Third, the findings would compel Alumet to operate at a loss, contrary to the reasonable diligence standard. We will consider these assertions in turn.

**i**

■ As we have mentioned, an implied covenant embodies a standard of objective reasonableness. It does not make one party a prisoner to the subjective preferences or expectations of the other. It does not follow, however, that expectations are entirely irrelevant to a question of reasonable diligence. To the contrary, the expectations of the parties to a mineral lease may be considered in determining whether an implied covenant to produce diligently has been breached. *Dulin v. West,* 35 Colo. App. 6, 528 P.2d 411 (1974). We think this is especially true where, as here, a lessor's expectations are based on the lessee's rep-

resentations of what the mine can and will produce.

■ Here, Alumet, a firm with significant experience in the phosphate industry, albeit not in southeastern Idaho, represented to Bear Lake that upon completion of the intended processing plant, the company would produce annually at least one million tons of ore. Alumet now contends that these representations were intended merely to show the maximum productive capacity of the plant under ideal conditions, not to project the level of commercially feasible operations. This contention goes more to the weight of the evidence than to its admissibility. Moreover, even if the testimony were given the narrow significance urged by Alumet, it would remain relevant to establish that the physical environmental factors, such as limited road access, would not preclude operation of the mine at a productive level of one million tons per year. We hold that the judge did not err in allowing Bear Lake's witnesses to testify regarding Alumet's representations of future production, nor in using that evidence in formulating the court's findings.

**ii**

■ The burden of proof issue requires more extended discussion. In an action where a mining lessee's failure to develop the property is raised as a claim or defense, and the lessee's performance under the lease is tested according to the standard of reasonable diligence, the lessor must allege and prove that the lessee has failed to meet that standard. *See* 2 W.L. SUMMERS, THE LAW OF OIL AND GAS § 414 (1959). This rule is consistent with the general principle that a party seeking affirmative relief—including a defendant who asserts an affirmative defense—has the burden of proof on that issue at trial. *E.g., Pace v. Hymas,* 111 Idaho 581, 726 P.2d 693 (1986).

■ In this case, Alumet points to several passages in the district judge's findings of fact and conclusions of law that arguably imply an erroneous allocation of the burden of proof. In Finding of Fact No. 14, the judge said, "[T]he record of this case contains no substantial competent evi-

dence ... that a prudent operator in good faith would not be able to mine 1,000,000 tons of ore from the Alumet–Bear Lake leases in a mining season." Similarly, in a memorandum decision preceding the findings of fact, the judge stated, "[T]here is no evidence in the record to support the conclusion that Alumet could not have proceeded with a more extensive mining operation." These passages could be regarded simply as unfortunate lapses into double negative phraseology. However, Alumet vigorously asserts that they reveal the judge's perception that it was the lessee's burden to show that it was complying with the standard of reasonable diligence, rather than the lessor's burden to prove the contrary.

█ Reading the judge's memorandum decision, findings of fact, and conclusions of law in their entirety, we are not persuaded that the judge misunderstood the burden of proof. Statements substantially similar to those quoted here, but expressed in positive terms free of double negatives, can be found in the judge's decision. Moreover, in order to establish reversible error, an appellant must not only point to the error, but must show the resultant prejudice. *E.g., Hooton v. City of Burley,* 70 Idaho 369, 219 P.2d 651 (1950); *Viehweg v. Thompson,* 103 Idaho 265, 647 P.2d 311 (Ct.App.1982). A misunderstanding of the burden of proof does not invariably result in prejudice. *See Matter of Adoption of Baby Boy Irons,* 235 Kan. 540, 684 P.2d 332, 340–42 (1984). Here, Alumet has not demonstrated, and we do not discern, how any of the judge's findings in this case were reasonably likely to turn on the burden of proof. This is not a case in equipoise where the burden of proof—that is, the risk of nonpersuasion—would determine the outcome. On each of his factual findings and ultimate conclusions, the judge made it clear that he had been persuaded by the evidence. Accordingly, we hold that Alumet has not established reversible error on this issue.

iii

█ Finally, we consider Alumet's assertion that the district court's judgment

would force it to operate at a loss for the lessor's benefit, contrary to the reasonable diligence standard. It is true, of course, that a lessee need not wholly forego its right to make a profit. *E.g., Superior Oil Co. v. Devon Corp.,* 604 F.2d 1063 (8th Cir.1979); *Taylor v. Kingman Feldspar Co.,* 41 Ariz. 376, 18 P.2d 649 (1933); *Sonat Exploration Co. v. Superior Oil Co.,* 710 P.2d 221 (Wyo.1985). However, a lessee does not have unbridled discretion to defer development in order to achieve maximum future profits. Economic conditions may vary during the life of the lease. As our Supreme Court has noted, an implied covenant to produce could require a lessee to incur a net loss during a period of unfavorable market conditions. *Archer v. Mountain Fuel Supply Co.,* 102 Idaho 852, 856, 642 P.2d 943, 947 (1982). A lessee who desires to avoid this risk may bargain for a provision in the lease that royalties are not the sole or primary consideration to the lessor. *Id.*

█ Where an implied covenant exists, the lessee must act in good faith to achieve the purpose of the lease for both parties. Here, the individuals comprising the Bear Lake Grazing Company and its predecessor, the Bear Lake Stockmen's Association, waited more than twenty years, from execution of the lease in 1964 to entry of the district court's judgment on remand in 1987, to receive significant royalties. Although a recession occurred during part of this period, a reasonably diligent operator could have invested in the mining and distribution infrastructure, such as a processing plant and a transportation system, which would be necessary for marketing the product when economic conditions improved. As the district judge found, other phosphate mining companies in southeastern Idaho had made such investments. We conclude that the judge did not err in determining that a reasonably diligent operator could have been producing one million tons of ore annually by the time the judgment on remand was entered.

C

Our conclusion is not disturbed by Alumet's claim that Bear Lake improperly

sought a temporary restraining order, and that the district judge refused to disqualify himself, before the judgment was entered. We see no material prejudice flowing from the TRO proceedings. We deem it unnecessary to discuss them further. As to the question of disqualification, we see nothing in the TRO, or in the pattern of the judge's orders throughout this case, indicating actual bias or prejudice within the meaning of I.R.C.P. 40(d)(2).

Neither would Alumet have been entitled to a disqualification without cause under I.R.C.P. 40(d)(1). Numerous contested matters already had been submitted to the judge for his determination. On remand, the parties had agreed to submit the merits of this case without further evidence but upon additional briefing. This case is distinguishable from *Jahnke v. Moore*, 112 Idaho 944, 737 P.2d 465 (Ct.App.1987), cited by Alumet. There we held that a right to disqualification without cause may exist after a remand if the case is set for trial peremptorily, before the parties and their counsel have enjoyed an opportunity to make meaningful decisions on whether to accept or reject the judge likely to hear the case. That circumstance did not exist here.

### III

■ We now turn to the appeals numbered 17316 and 17655, both of which relate to proceedings under I.A.R. 13. During those proceedings, the parties stipulated to augment the record on appeal with a final accounting on Alumet's ore extraction from the leased premises in 1988. The accounting showed that after payment of royalties and production costs, the net proceeds of extraction were only $30.23. Alumet extracted sufficient ore to generate a royalty payment to Bear Lake of $46,-317.99—implying an ore quantity of approximately 185,272 tons. This fell far short of the one million tons required to cure the default. Accordingly, it appears that the lease has been—or, upon eventual entry of an appropriate order by the district court, will be—terminated.

Given these facts, it cannot be said that Alumet has been prejudiced by the district court's order denying its "motion to strike" Bear Lake's Rule 13 motion. Neither has it been prejudiced by the court's order requiring Alumet to deposit the net mining proceeds during the appeal from the judgment. Accordingly, Alumet's challenges to these orders, in the appeals numbered 17316 and 17655, need not be addressed here.

■ By parity of reasoning, we believe the issue of a stay is no longer viable. By waiting until only a few weeks remained in the cure period before seeking such a stay, either from the district court or from this Court, Alumet implicitly made it clear that no cure would be attempted. Alumet's only hope of avoiding a termination of the lease was to obtain a reversal of the October judgment, perhaps with a determination of some new level of required mining and a new period for cure. That, as our opinion demonstrates, has not happened.

Accordingly, the judgment of the district court—interpreting the implied covenant in the lease to require extraction and removal of one million tons of ore annually, and allowing one year from the date of the judgment to effect a cure—is affirmed. The postjudgment orders relating to Bear Lake's motion under I.A.R. 13 are also affirmed. Costs are awarded to Bear Lake as against both appellants in appeals 17212 and 17219. Costs are further awarded to Bear Lake as against Alumet in appeals 17316 and 17655. No attorney fees are awarded.

WALTERS, C.J., and SWANSTROM, J., concur.